**GLOBETROTTER SOFTWARE, INC.,**
Plaintiff–Cross Appellant,

and

**Matthew Christiano, Third Party**
Defendant–Appellee,

v.

**ELAN COMPUTER GROUP, INC. and**
Ken Greer, Defendants/Third Party
Plaintiffs–Appellants,

and

**Rainbow Technologies, Inc. and**
Rainbow Technologies North
America, Inc., Defendants.

Nos. 03–1179, 03–1205.

United States Court of Appeals,
Federal Circuit.

March 23, 2004.

See also 236 F.3d 1363.

John I. Alioto, Alioto & Alioto LLP, of San Francisco, CA, argued for defendants/third party plaintiffs-appellants. With him on the brief was Linda M. Alioto.

Before LINN, Circuit Judge, ARCHER, Senior Circuit Judge, and DYK, Circuit Judge.

DYK, Circuit Judge.

The main appeal by Ken Greer ("Greer") is from the decision of the United States District Court for the Northern District of California granting summary judgment on his state-law counterclaims for tortious interference with prospective economic advantage and unfair competition arising from Globetrotter's allegations that Elan Computer Group, Inc. ("Elan") and Greer infringed U.S. Patent Nos. 5,390,297 ("the '297 patent"), 5,386,369 ("the '369 patent"), and 5,671,412 ("the '412 patent"), *Globetrotter Software, Inc. v. Elan Computer Group, Inc.*, No. C–98–20419–JF, slip op. at 3–7 (N.D.Cal. Nov. 13, 2002) ("*Globetrotter III* "). Because Globetrotter's actions were not objectively baseless, state-law claims arising from Globetrotter's communications regarding potential patent litigation were preempted. We therefore affirm the grant of summary judgment on these counterclaims.

On the cross-appeal relating to alleged infringement of the '297 patent, this case is before us for a second time. In our first decision, *Globetrotter Software, Inc. v. Elan Computer Group, Inc.*, 236 F.3d 1363 (Fed.Cir.2001) ("*Globetrotter I* "), which involved Globetrotter's appeal from the district court's denial of a preliminary injunction, we construed the "license file means" limitation of claim 55 of the '297 patent. However, we expressly reserved the issue "whether Globetrotter at trial could establish infringement based on the proper construction of the license file means limitation of claim 55." *Id.* at 1370 n. 3. We also

Bruce A. Wessel, Irell & Manella LLP, of Los Angeles, CA, argued for plaintiff-cross appellant and third party defendant-appellee. With him on the brief were Iian D. Jablon and Jason G. Sheasby.

did not decide whether the district court's construction of the "prevent" limitation was correct. *Id.* at 1370 & n. 3. These issues are now before us in Globetrotter's cross-appeal from the district court's grant of summary judgment of non-infringement of the asserted claims of the '297 patent on the ground that the license file means and prevent limitations were not satisfied, *Globetrotter Software, Inc. v. Elan Computer Group, Inc.*, No. C–98–20419–JF (N.D.Cal. Sept. 24, 2001) ("*Globetrotter II* ").

On the cross-appeal, we hold that the district court's construction of the prevent limitation was incorrect and that summary judgment of non-infringement of the license file means and prevent limitations was not proper. Accordingly, we vacate the grant of summary judgment with respect to version 5.0 of Elan's allegedly infringing software ("LM 5.0") and remand to the district court for further proceedings.

## BACKGROUND

### I

The main appeal here involves alleged misuse by Globetrotter of three patents it owns. However, on the cross-appeal, Globetrotter asserts only infringement of the '297 patent.

Each of the three patents is directed toward a license management system that permits a purchaser of software to use a particular application on more than one computer on a network, while including protections against copyright infringement that prevent the purchaser from using more copies of the software than it has licensed. In particular, the '297 patent is entitled "System for Controlling the Number of Concurrent Copies of a Program in a Network Based on the Number of Available Licenses." The system disclosed in the patent limits the number of copies of an application that can be in use on a network at a particular time to the number

of application licenses that have been purchased from the vendor of the software, although there is no limit on the number of computers on the network that can access the licenses or run the application so long as the licensed number of copies in use at any one time is not exceeded. For example, a purchaser can install a copy of a software application on each of ten computers on a network, even though the purchaser only has purchased three licenses for the application. The system of the '297 patent prevents the purchaser from using more than three of those copies at a time because there are only three licenses available to the purchaser. If a user were to attempt to use the application simultaneously on a fourth computer, the license management system would determine that no further licenses were available and the fourth computer would be prevented from running the application.

The '297 patent issued on February 14, 1995. Shortly thereafter, Auto-trol, then the '297 patent's assignee, asserted that the '297 patent covered Globetrotter's license management product. Globetrotter maintained that it did not infringe the '297 patent, and it intimated that "several of [the patent's] broader claims" might be invalid. (J.A. at A07681.) However, Globetrotter and Auto-trol entered into negotiations for a patent license agreement thereafter. Auto-trol ultimately assigned the '297 patent to Globetrotter on October 13, 1997.

Globetrotter also is the assignee of the '369 patent, entitled "License Metering System for Software Applications." It discloses a system for metering the use of software applications that prevents the problems of wear experienced in previous hardware-based metering systems. In addition, the system permits the vendor of the software to add value to the meter remotely, increasing the amount of soft-

ware that a lessor of the software may use, without compromising the security of the license metering system. Finally, the metering system may be used to monitor multiple applications simultaneously.

Globetrotter as well is the assignee of the '412 patent, entitled "License Management System for Software Applications." It discloses a license management system that allows program licensors to collect and organize their stored license records to increase the system's flexibility. The license records can include license modifiers that allow the licensor to provide flexibility in the use of the software to its purchasers. In addition, the vendor of the software can group the licenses to prevent the software purchaser from using different components of a suite of programs on different computers simultaneously. Finally, the system includes functions designed to mitigate common problems with license server networks.

## II

The alleged misuse of the three patents arises out of the following circumstances. Greer alleges that Rainbow Technologies, Inc. ("Rainbow") was negotiating to purchase all of the outstanding shares of Elan not already owned by Rainbow for a price of $4,000,000. The negotiated agreement also provided that Greer, then the majority shareholder, chairman, and CEO of Elan, would receive a two-year employment agreement with a salary of $120,000, a commission on sales of Rainbow's license management software, and stock options. At the time, Rainbow also distributed Elan's allegedly infringing software. While these negotiations were pending, Globetrotter sent an e-mail and two letters alleging infringement of its patents. First, on October 3, 1997, Michael Christiano ("Christiano"), Globetrotter's president and CEO, sent an e-mail to Walter Straub ("Straub"), the president and CEO of Rainbow, suggesting that Rainbow investigate whether Elan's products infringed Globetrotter's patents before purchasing Elan. Next, on October 7, 1997, Globetrotter sent a letter to Greer alleging that Elan infringed the '369 and '412 patents. A copy of the letter was also sent to Straub. On October 20, 1997, shortly after Globetrotter acquired the '297 patent, Globetrotter sent a second letter to Greer and Straub, alleging that Elan also infringed the '297 patent. Greer alleges that Globetrotter in bad faith notified Rainbow of alleged patent infringement by Elan solely to cause Rainbow to abandon the planned purchase, which Rainbow did, with the result that Rainbow later acquired Elan for a much lower price and, apparently, did not enter into the planned agreement with Greer.

Based on these events, Greer filed state-law claims against Globetrotter and Christiano alleging tortious interference with prospective economic advantage and unfair competition.[1] (These claims were presented in the patent litigation described below as counterclaims against Globetrotter and third party claims against Christiano.) In *Globetrotter III*, the district court granted summary judgment in favor of Globetrotter on Greer's tortious interference counterclaim. Slip op. at 6. The court held, *inter alia:* "This Court already has ruled that GLOBEtrotter's patent suit was not objectively baseless 'sham' litigation. Accordingly, under the law of the case, GLOBEtrotter was entitled to pur-

---

1. Elan and Rainbow also brought several counterclaims and third party claims against Globetrotter and Christiano under both federal and state law. In *Globetrotter III*, the district court granted summary judgment in fa-

vor of Globetrotter and dismissed these claims. Slip op. at 6–7. Neither Elan nor Rainbow has appealed the dismissal of these claims.

sue its patent litigation and to notify Rainbow and the market of its patent claims." *Id.* at 5. However, the court did not explicitly address whether Globetrotter's claims with respect to the '369 patent and the '412 patent, which were not involved in Globetrotter's suit, were not objectively baseless.[2] In addition, the court appeared to conclude that there was an absence of proof that the e-mail and letters were the cause of Rainbow's initial decision not to acquire Elan or enter into the planned agreement with Greer. The district court also granted summary judgment in favor of Globetrotter on Greer's state-law unfair competition counterclaim. *Id.* at 6–7. The grounds for this action are not entirely clear, but the court appeared to conclude that there was an absence of proof that the public was deceived. *See id.*

### III

The cross-appeal involves a claim by Globetrotter against Elan and Greer for infringement of the '297 patent. Globetrotter's suit, which was commenced on November 14, 1997,[3] alleged infringement of claims 3, 23, and 55 of the '297 patent.[4] Claim 3 of the '297 patent reads:

> 3. A license management system for limiting the number of copies of a given computer program that are permitted to run simultaneously on one or more nodes of a network in which said nodes are connected, said limiting being according to the number of licenses for said given computer program that are authorized for said network; said system comprising:
>
> *license file means on at least one of said nodes for storing at least one of said licenses;*
>
> program storage means for storing a copy of said given computer program on each of said nodes at which it is desired to run a copy of said given computer program; and
>
> license management means operatively linked to each said copy, said license management means being responsive to a request from said copy to which it is operatively linked for searching said nodes to locate one of said license file means that has a license that is available for authorizing use at a local one of said nodes at which said requesting copy is stored, said search first being made at said local node and if no such license file means having an available license is located at said local node, said search continuing in seriatim among said nodes other than said local node until one such license file means having an available license is located or until all said nodes have been searched without locating one such license file means having an available license;
>
> said *license management means* being responsive to the search of all of said nodes without locating one such license file means having an available license *for returning to said copy at*

---

2. Globetrotter has never sued Elan, Greer, or Rainbow for infringement of either the '369 patent or the '412 patent.

3. In the district court, Globetrotter alleged that three products infringe the '297 patent: Elan's ELM 5.0, Rainbow's SentinelLM 5.0 (which included the same software as ELM 5.0, but was sold by Rainbow under its trademark pursuant to a license with Elan), and Rainbow's SentinelLM 6.0. However, Globetrotter dismissed its appeal against Rainbow, so its claims of infringement on appeal are limited to LM 5.0, that is, Elan's ELM 5.0 product. Greer alone filed a brief in opposition to the cross-appeal; Elan has not appeared in this court to defend against Globetrotter's cross-appeal.

4. Globetrotter also asserted infringement of claims 32, 56, 57, 59, 60, and 63 of the '297 patent in the district court, but it does not appeal the district court's judgment of noninfringement of those claims.

*said local node a message preventing said copy from being run at said local node in response to said request.*

'297 patent, col. 17, ll.12–47 (emphases added). Claim 23 reads:

23. A license management system for limiting the number of copies of a given computer program that are permitted to run simultaneously on one or more nodes of a network in which said nodes are connected, said limiting being according to the number of licenses for said given computer program that are authorized for said network, said licenses being loaded onto one or more of said nodes; said system comprising:

means for storing a copy of said given computer program on each of said nodes at which it is desired to run a copy of said given computer program; and

license management means operatively linked to each said copy, said license management means being responsive to a request from said copy to which it is operatively linked for searching said nodes to locate one of said licenses that is available for use at a local one of said nodes at which said requesting copy is stored, said search first being made at said local node and if no available license is located at said local node, said search continuing in seriatim among said nodes other than said local node until an available license is located or until all said nodes have been searched without locating an available license; said *license management means* being responsive to the search of all said nodes without locating an available license *for returning to said copy at said local node a message preventing said copy from being run at said local node in response to said request.*

*Id.* at col. 22, l.49—col. 23, l.9 (emphases added). Claim 55 reads:

55. A license management system for limiting the number of copies of a given computer program that are permitted to run simultaneously on one or more nodes of a network in which said nodes are connected, said limiting being according to the number of licenses for said given computer program that are authorized for said network; said system comprising:

*license file means on at least one of said nodes for storing at least one and up to a selectable authorized number of said licenses;*

program storage means for storing a copy of said given computer program on at least one of said nodes without limiting the running of said given computer program to running on said one node; and

license management means responsive to a request to run, said request being from one of said copies at a particular one of said nodes, for searching as many of said nodes as are necessary to locate one of said license file means that has a license that is available for authorizing a copy of said given computer program to run at said particular one of said nodes;

said *license management means* being responsive to said search not locating any of said license file means having an available license *for returning to said requesting copy a message preventing said copy from running in response to said request.*

*Id.* at col. 31, ll.11–37 (emphases added). In two separate orders, the district court granted the defendants' motions for summary judgment of non-infringement of claims 3, 23, and 55 (among other claims) of the '297 patent, holding that the accused infringing systems did not include two limitations in the asserted claims: the license file means limitation and the prevent limitation. Claim 55 was addressed in the

court's summary judgment order of October 26, 1999, and claims 3 and 23 were addressed in an order dated September 24, 2001.

### A. The License File Means Limitation

Claims 3 and 55 include a license file means limitation. *See* '297 patent, col. 17, ll.19–20 (claim 3); col. 31, ll.18–20 (claim 55). We addressed the district court's claim construction of this limitation in *Globetrotter I,* holding that "the specification and drawings [of the '297 patent] show that a UID [unique identification] is 'necessary structure' in order to perform the function of storing licenses by the license file means." 236 F.3d at 1369. However, we noted that, "as mandated by 35 U.S.C. § 112, paragraph 6, the license file means limitation of claim 55 also covers equivalents of the structures containing a UID." *Id.* at 1369 n. 2.

We did not reach the question of infringement of the license file means limitation in *Globetrotter I. Id.* at 1370 n. 3. The district court originally granted summary judgment as to claim 55. After the appeal, it also granted summary judgment as to claim 3. Globetrotter twice sought reconsideration of the district court's earlier ruling that "there was no evidence demonstrating that [LM 5.0] utilizes a UID," *Globetrotter II,* slip op. at 3, and it submitted expert testimony asserting that the accused infringing systems generated UIDs for their license files. However, the district court held that this testimony "is insufficient to show that the license key *uniquely* identifies each license file as required under the patent." *Id.; see also Globetrotter III,* slip op. at 2–3.

### B. The Prevent Limitation

Each of the asserted claims includes a "license management means" limitation wherein the license management means

returns "a message preventing" the copy of the application from running if no license is available. *See* '297 patent, col. 17, ll.42–47 (claim 3); col. 23, ll.4–9 (claim 23); col. 31, ll.33–37 (claim 55). The district court construed this limitation of the claim to require the license management means to "return[ ] a run-prevention message where no available license is found." *Globetrotter Software, Inc. v. Elan Computer Group, Inc.,* 1999 WL 33490210 at 6, No. C–98–20419–JF (N.D.Cal. Oct. 26, 1999) (*"Claim Construction Order"*). However, in another order on the same date, the district court granted summary judgment of non-infringement as to claim 55 because "LM 5.0 does nothing actively to prevent a program from running," but merely returns "a no-license status." *Globetrotter Software, Inc. v. Elan Computer Group, Inc.,* 1999 WL 33493606 at 18 (N.D.Cal. Oct. 26, 1999) (*"Summary Judgment Order"*). We declined to decide in *Globetrotter I* whether the district court's interpretation of this limitation was correct. 236 F.3d at 1370 & n. 3. After the appeal, the district court also granted summary judgment of non-infringement as to claims 3 and 23 because the accused infringing system did not actively prevent a program from running. *Globetrotter II,* slip op. at 4–5. Globetrotter did not submit additional evidence after the appeal related to the defendants' alleged infringement of the prevent limitation.

### IV

The district court entered judgment dismissing the claims and counterclaims on the merits on November 13, 2002. *Globetrotter Software, Inc. v. Elan Computer Group, Inc.,* No. C–98–20419–JF (N.D.Cal. Nov. 13, 2002) (*"Judgment"*). Greer timely filed his notice of appeal on December 9, 2003. Globetrotter timely filed a notice of its cross-appeal on December 20, 2002.[5]

---

5. Elan and Rainbow subsequently abandoned their appeals. Globetrotter also dismissed its

On the cross-appeal, Greer has presented briefing and argument, but Elan has not. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(1).

## DISCUSSION

■ This case requires us to resolve two issues: (1) whether the district court properly granted summary judgment with respect to Greer's state-law claims for tortious interference with prospective economic advantage and unfair competition, and (2) whether the district court properly granted summary judgment with respect to Globetrotter's claims of infringement of claims 3, 23, and 55 of the '297 patent as to LM 5.0. We review a district court's grant of summary judgment without deference. *Kumar v. Ovonic Battery Co.*, 351 F.3d 1364, 1367 (Fed.Cir.2003). We apply Federal Circuit law not only to the patent issues but also in deciding whether the patent laws preempt a state-law tort claim. *See, e.g., Midwest Indus., Inc. v. Karavan Trailers, Inc.*, 175 F.3d 1356, 1359 (Fed. Cir.1999) (*en banc* in relevant part).

### I

### A

Greer asserts state-law claims of tortious interference with prospective economic advantage [6] and unfair competition, based on the allegations of patent infringement in Globetrotter's e-mail and letters sent to Rainbow. We have held that federal patent law preempts state-law tort liability for a patentholder's good faith conduct in communications asserting infringement of its patent and warning about potential litigation. *See, e.g., Zenith Elecs. Corp. v. Exzec, Inc.*, 182 F.3d 1340, 1355 (Fed.Cir.1999). State-law claims such as Greer's can survive federal preemption only to the extent that those claims are based on a showing of "bad faith" action in asserting infringement. *Id.* Accordingly, to avoid preemption, "bad faith must be alleged and ultimately proven, even if bad faith is not otherwise an element of the tort claim." *Id.* This preemption is based on the following concept:

> "A patentee that has a good faith belief that its patents are being infringed violates no protected right when it so notifies infringers." Accordingly, a patentee must be allowed to make its rights known to a potential infringer so that the latter can determine whether to cease its allegedly infringing activities, negotiate a license if one is offered, or decide to run the risk of liability and/or the imposition of an injunction.

*Va. Panel Corp. v. MAC Panel Co.*, 133 F.3d 860, 869 (Fed.Cir.1997), *cert. denied*, 525 U.S. 815, 119 S.Ct. 52, 142 L.Ed.2d 40 (1998) (quoting *Mallinckrodt, Inc. v. Medipart, Inc.*, 976 F.2d 700, 709 (Fed.Cir. 1992)); *see also Virtue v. Creamery Package Mfg. Co.*, 227 U.S. 8, 37–38, 33 S.Ct. 202, 57 L.Ed. 393 (1913) ("Patents would be of little value if infringers of them could not be notified of the consequences of infringement, or proceeded against in the courts. Such action, considered by itself, cannot be said to be illegal."). The federal

---

appeal against Rainbow involving allegations of infringement by Rainbow.

6. The elements Greer must establish for his claim of tortious interference with prospective economic advantage are:

(1) the existence of a prospective business relationship containing the probability of future economic benefit for Greer; (2) GLOBEtrotter's knowledge of the relationship; (3) intentional acts by GLOBEtrotter designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) resulting damage. Additionally, Greer must establish a sixth element, that GLOBEtrotter's interference was wrongful by some legal measure other than the fact of the interference itself.

*Globetrotter III*, slip op. at 4 (citation omitted).

patent laws thus bar state-law liability for communications concerning alleged infringement so long as those communications are not made in "bad faith."

For the purposes of his state-law claims, Greer argues that Globetrotter engaged in bad faith, but he endeavors to show it only through attempts to demonstrate subjective bad faith. For example, Greer argues that the timing of Globetrotter's e-mail and letters alleging infringement shows that Globetrotter sought only to interfere with Rainbow's pending acquisition of Elan and agreement with Greer. Greer also argues that Globetrotter believed that the patent was invalid, relying on statements made by Globetrotter and Christiano before Auto-trol assigned the '297 patent to Globetrotter. In addition, Greer notes that Globetrotter never actually sued for infringement of the '369 or the '412 patents, demonstrating, in his view, that Globetrotter never intended to do so.

In the district court, Greer made no effort to establish that the claims asserted by Globetrotter with respect to the '369 or '412 patents were objectively baseless, either because those patents were obviously invalid or plainly not infringed. With respect to the '297 patent, Greer conceded at oral argument before us that the only proof of objective baselessness was the fact that the district court granted summary judgment of non-infringement of the '297 patent. However, we conclude that Globetrotter's claim of infringement of the '297 patent was not objectively baseless, as is amply demonstrated by our reversal of that grant of summary judgment, see Part II, infra.[7] Thus, the question before us is whether the bad faith standard of Zenith can be satisfied in the absence of a showing that the claims asserted were objectively baseless. We hold that it cannot.

## B

The jurisprudential background of the bad faith standard is as follows: In Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc., 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961), the Supreme Court recognized an exception to antitrust liability for activities directed toward influencing government action. Id. at 135–36, 81 S.Ct. 523. The Court construed the Sherman Act not to reach such activities in view of its Sherman Act precedent and because of the First Amendment concerns that would arise if the Act were interpreted to reach those activities. Id. at 136–38, 81 S.Ct. 523. However, the Court noted that immunity would not exist if the accused activity, although "ostensibly directed toward influencing governmental action, is a mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor." Id. at 144, 81 S.Ct. 523.

Although Noerr involved only "mere attempts to influence the passage or enforcement of laws," id. at 135, 81 S.Ct. 523 the Court later extended the Noerr immunity to attempts to petition the government for redress through litigation in the courts, Cal. Motor Transp. Co. v. Trucking Unlimited, 404 U.S. 508, 510–11, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972). However, those decisions did not resolve the question "whether litigation may be sham merely because a subjective expectation of success does not motivate the litigant." Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc., 508 U.S. 49, 57, 113 S.Ct. 1920, 123 L.Ed.2d 611 (1993). The Court resolved that question in Professional Real Estate, holding that "an objectively reasonable effort to litigate cannot be

---

7. In addition, Greer concedes that, in the district court, he "did not claim that the filing of the patent infringement lawsuit by Globe-

trotter was in any way wrongful." (Br. for Defs./3d Party Pls.-Appellants at 35.)

sham regardless of subjective intent." *Id.* The Court elaborated:

> [T]he lawsuit must be objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits. If an objective litigant could conclude that the suit is reasonably calculated to elicit a favorable outcome, the suit is immunized under *Noerr,* and an antitrust claim premised on the sham exception must fail.

*Id.* at 60, 113 S.Ct. 1920.[8]

The Supreme Court has not addressed the question whether the *Professional Real Estate* standard applies outside the context of actual litigation. However, our sister circuits, almost without exception, have applied the *Noerr* protections to pre-litigation communications. The Fifth Circuit stated:

> Given that petitioning immunity protects joint litigation, it would be absurd to hold that it does not protect those acts reasonably and normally attendant upon effective litigation. The litigator should not be protected only when he strikes without warning. If litigation is in good faith, a token of that sincerity is a warning that it will be commenced and a possible effort to compromise the dispute. This is the position taken by most of the courts that have considered the question.

*Coastal States Mktg., Inc. v. Hunt,* 694 F.2d 1358, 1367 (5th Cir.1983). Other circuits and commentators agree. *See, e.g., McGuire Oil Co. v. Mapco, Inc.,* 958 F.2d 1552, 1560 (11th Cir.1992); *A.D. Bedell Wholesale Co. v. Philip Morris Inc.,* 263 F.3d 239, 252–53 (3d Cir.2001); *Primetime 24 Joint Venture v. Nat'l Broad. Co.,* 219

F.3d 92, 100 (2d Cir.2000); 1 Philip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 205e, at 237–38 (2d ed. 2000) ("*Noerr* protects the right to petition the government. Although a mere threat directed at one's competitor to sue or to seek administrative relief does not involve or 'petition' the government, it would be anomalous and socially counterproductive to protect the right to sue but not the right to threaten suit."). *But cf. Cardtoons, L.C. v. Major League Baseball Players Ass'n,* 208 F.3d 885, 890–91 (10th Cir.2000) (refusing to apply *Coastal States* outside of the context of *Noerr* but noting that "it would be very tempting to apply *Coastal States* in the present case").

These cases have dealt almost exclusively with the protections provided by federal antitrust law for pre-litigation communications. However, in another line of cases, our sister circuits have also applied the *Noerr-Professional Real Estate* line of cases to bar state-law liability (as opposed to federal antitrust liability) for pre-litigation communications. *See, e.g., IGEN Int'l, Inc. v. Roche Diagnostics GMBH,* 335 F.3d 303, 310 (4th Cir.2003); *Cheminor Drugs, Ltd. v. Ethyl Corp.,* 168 F.3d 119, 128 (3d Cir.1999); *South Dakota v. Kan. City S. Indus., Inc.,* 880 F.2d 40, 50–51 (8th Cir.1989). This extension of *Noerr* is based on the fact that "the same First Amendment principles on which [*Noerr*] immunity is based apply to the [state-law] tort claims." *Cheminor Drugs,* 168 F.3d at 128. The Fourth Circuit has recently noted that "the [*Noerr*] doctrine has now universally been applied to business torts," despite the doctrine's origins in the federal

---

**8.** The Court further held that the plaintiff must also establish subjective bad faith: "Only if the challenged litigation is objectively meritless may a court examine the litigant's subjective motivation. Under this second part of our definition of sham, the court should focus on whether the baseless lawsuit conceals 'an attempt to interfere *directly* with the business relationships of a competitor.'" *Prof'l Real Estate,* 508 U.S. at 57, 113 S.Ct. 1920 (quoting *Noerr,* 365 U.S. at 144, 81 S.Ct. 523).

antitrust context. *IGEN Int'l,* 335 F.3d at 310.

We have also adopted a similar standard for pre-litigation communications alleging patent infringement, holding that "bad faith is not supported when the information is objectively accurate." *Golan v. Pingel Enter., Inc.,* 310 F.3d 1360, 1371 (Fed.Cir.2002) (quoting *Mikohn Gaming Corp. v. Acres Gaming, Inc.,* 165 F.3d 891, 897 (Fed.Cir.1998)). Like this case, *Golan* involved state-law unfair competition and business tort claims based on the patentee's allegations of infringement. There, we held: "To show bad faith in Pingel's actions, Golan must offer clear and convincing evidence that Pingel *had no reasonable basis* to believe that the [accused infringing device] infringed Pingel's patents." *Id.* (emphasis added). Thus, we applied the *Professional Real Estate* objectively baseless test in a situation where, as here, the party challenged statements made in cease-and-desist letters by a patentee asserting its patent rights.

Our decision to permit state-law tort liability for only objectively baseless allegations of infringement rests on both federal preemption and the First Amendment. The federal patent laws preempt state laws that impose tort liability for a patentholder's good faith conduct in communications asserting infringement of its patent and warning about potential litigation. *See, e.g., Zenith,* 182 F.3d at 1355. In addition, the same First Amendment policy reasons that justify the extension of *Noerr* immunity to pre-litigation conduct in the context of federal antitrust law apply equally in the context of state-law tort claims.

■ Accordingly, the objectively baseless standard of *Professional Real Estate* applies to state-law claims based on communications alleging patent infringement, such as those in this case.[9] A plaintiff claiming that a patent holder has engaged in wrongful conduct by asserting claims of patent infringement must establish that the claims of infringement were objectively baseless. Greer has not even attempted to make such a showing here. The district court properly granted summary judgment dismissing Greer's claims because of his failure to show that Globetrotter's assertions of infringement were objectively baseless. In light of our disposition, we need not decide whether summary judgment was properly granted on other grounds, as well.

## II

We turn now to Globetrotter's claims of patent infringement with respect to claims 3, 23, and 55 of the '297 patent. Two claim limitations are at issue: the license file means limitation and the prevent limitation.

### A. The License File Means Limitation

■ The first of the two limitations at issue here appears only in claims 3 and 55. *See* '297 patent, col. 17, ll.19–20 (claim 3); col. 31, ll.18–20 (claim 55). We reject Greer's argument that claim 23 includes such a limitation. We construed this limitation in our earlier opinion in *Globetrotter I,* where we approved the following claim construction by the district court:

9. We have also held that federal patent law preempts state law that punishes merely "publicizing a patent in the marketplace[,] unless the plaintiff can show that the patentholder acted in bad faith." *Hunter Douglas, Inc. v. Harmonic Design, Inc.,* 153 F.3d 1318, 1336 (Fed.Cir.1998) (overruled in part on oth-er grounds by *Midwest Indus.,* 175 F.3d at 1359). We need not decide in this case whether the objectively baseless standard applies in the context of publicizing a patent through means other than pre-litigation communications.

LICENSE FILE MEANS FOR STORING is an area of memory on the disk of a NODE, capable of storing at least one LICENSE, *and containing at least a UID.* Equivalents of the structure just described also constitute LICENSE FILE MEANS FOR STORING.

. . . .

A UID is data assigned to a LICENSE FILE which is different from the data assigned to any other LICENSE FILE then in existence with which the first mentioned LICENSE FILE otherwise may be confused.

236 F.3d at 1366 (quoting *Claim Construction Order,* slip op. at 15, 19 (emphasis added by *Globetrotter I*)). As noted above, Globetrotter submitted additional evidence of infringement after *Globetrotter I,* but the district court denied Globetrotter's two motions for reconsideration of the district court's earlier grant of summary judgment of non-infringement. Thus, we must decide whether summary judgment was appropriate under this interpretation of the license file means limitation. Regrettably, both parties' expert reports and other evidence on summary judgment were both highly technical and confusing. "It is not our task, nor is it the task of the district court, to attempt to interpret confusing or general testimony to determine whether a [claim] has been made out, particularly at the summary judgment stage." *Schumer v. Lab. Computer Sys., Inc.,* 308 F.3d 1304, 1316 (Fed.Cir.2002). As best we can understand the record, the situation is as follows, and it does not support a grant of summary judgment.

Unlike the patented invention, LM 5.0 itself appears not to generate a UID for each file. But that is not a requirement of the claims at issue here, though it is a requirement of other claims that include a "means for assigning a[UID]" limitation. *See, e.g., '297* patent, col. 17, ll.50–51 (claim 4). The asserted claims merely require that each license file have a UID. There is also no requirement that each license in the license file have a separate UID.

Elan sells its license management software to producers of application software, not the end users of the application software. As provided to producers, the license files for LM 5.0 do not each have a UID, so LM 5.0 does not directly infringe the '297 patent. However, each producer has a unique Salt,[10] and each application created by the producer has unique information that identifies the particular application (*e.g.,* its name and version number). Globetrotter contends that, when combined with other information identifying a license file, the Salt and the application's identifying information can create a UID for the file such that the asserted claims of the '297 patent are infringed. In such a situation, Globetrotter argues, Elan and Greer can be liable for induced infringement pursuant to 35 U.S.C. § 271(b).

Globetrotter presented expert testimony to this effect in its motions for reconsideration of the district court's grant of summary judgment of non-infringement. First, Globetrotter's expert Dr. Rajive Bagrodia ("Bagrodia") described how LM 5.0 creates unique "license keys," which he alleged uniquely identify the license files used by LM 5.0:

Contained in [LM 5.0] is a license key generator, which uses as part of its inputs the following: (1) information about the application being licensed (e.g. name, version, terms of use) ("Input 1"); (2) the vendor's Salt ("Input 2"). The use of the unique Salt will ensure that the license keys generated by a vendor are

---

**10.** A Salt is a variable-length string of data selected by a particular producer that uniquely identifies that producer.

unique to that vendor—different from the license keys that can be generated by any other entity (assuming the other entity does not steal the Salt).

(J.A. at A04934.) Thus, according to Bagrodia, license keys created by application software producers using LM 5.0 will have UIDs because the license keys are based on the application's unique identifying information and the vendor's unique Salt.

The defendants responded with testimony showing that ID numbers created by LM 5.0 are not unique. However, these ID numbers make up only a portion of the LM 5.0 license file identifier—the LM 5.0 license key includes not only the ID numbers, but also the Salt and the application identifying information. So long as the Salt and application identifying information are unique to the license file, the license key can uniquely identify the license file even if the ID number is not unique. Therefore, the testimony proffered by the defendants does not refute Globetrotter's showing that a UID is created when the ID numbers are combined with the purchaser's Salt and the pertinent application's identifying information to create the LM 5.0 license key.[11] The testimony by Bagrodia accordingly creates an issue of material fact as to whether LM 5.0 infringes the '297 patent when configured by application software producers using LM 5.0, and whether Elan and Greer actively and knowingly induced such infringement of the patent by the application software producers. Because the testimony proffered by Globetrotter raises issues of material fact, the district court's grant of summary judgment must be vacated.

### B. The Prevent Limitation

■ We now turn to the prevent limitation, which the district court also found was not satisfied by LM 5.0. This limitation appears in each of the asserted claims. *See* '297 patent, col. 17, ll.42–47 (claim 3); col. 23, ll.4–9 (claim 23); col. 31, ll.33–37 (claim 55). We did not decide in *Globetrotter I* whether the district court's construction of the prevent limitation was correct. *See* 236 F.3d at 1370 & n. 3. Thus, we must first decide whether the district court correctly construed the prevent limitation.

As noted above, the district court construed the claim to require the license management means to perform the function of "returning a run-prevention message where no available license is found." *Claim Construction Order,* slip op. at 16. However, it altered its construction when applying it, interpreting its claim construction "to mean that the license management means must actively prevent a program from running when no license is available, and that the run-prevention limitation is not met if the license management means merely returns a status message indicating that no license is available." *Globetrotter II,* slip op. at 4. LM 5.0 does not actively prevent a program from running if no licenses are available. Instead, it merely sends a signal that causes the program requesting a license to stop itself from running. Therefore, in accordance with its active prevention interpretation, the district court granted summary judgment of non-infringement.

First, we must consider whether the district court's claim construction was correct. In construing a patent's claims, we look first to their language. *Vitronics*

---

**11.** We note that there is also much argument and evidence presented concerning whether the Salt itself creates a UID, with the parties' experts providing various estimates as to how often the Salt standing alone will provide a UID. Neither party's expert testimony is sufficiently clear or contains sufficient reasoning to enable us to address this issue with any confidence at this stage. *Cf. Schumer,* 308 F.3d at 1316.

*Corp. v. Conceptronic, Inc.,* 90 F.3d 1576, 1582 (Fed.Cir.1996). Although the language of each of the asserted claims is slightly different, each claim includes a limitation requiring the license management means to send "a message preventing" an external program from running when there are no available licenses for the requesting program. *See* '297 patent, col. 17, ll.45–46 (claim 3); col. 23, l.7 (claim 23); col. 31, l.36 (claim 55). The word "prevent" means "to keep from occurring; avert; hinder" or "to hinder or stop from doing something." *Random House Webster's Unabridged Dictionary* 1535 (2d ed.1998); *see also Webster's 3d New International Dictionary* 1798 (2002) (defining "prevent" as "to keep from happening or existing esp. by precautionary measures: hinder the progress, appearance, or fulfillment of: make impossible through advance provisions"). This language is ambiguous; it is unclear whether the message itself must actively stop the requesting program from running or whether the message can merely be a signal that keeps the requesting program from running when it is received. Therefore, we must look to the intrinsic evidence to determine whether it sheds light on the meaning of the claim term "message preventing." *See Deering Precision Instruments, L.L.C. v. Vector Distribution Sys., Inc.,* 347 F.3d 1314, 1323 (Fed.Cir.2003); *Vitronics Corp.,* 90 F.3d at 1582.

The specification of the '297 patent describes two embodiments of the disclosed license management system. In both embodiments, the license manager program searches for licenses only when a requesting program, which is distinct from the license management software described in the patent, requests a license from the license management software. For example, the specification states:

> The copy of the given computer program 24A on the local node 14 contacts the license manager 25A at the local node 14 by making a subroutine call. In response, the license manager 25A asks (Step 30) whether a license 27 exists on the local node 14 for the given computer program 24A.

'297 patent, col. 9, ll.49–54; *see also id.* at col. 13, ll.51–56; Figs. 3, 6 (showing that the license manager routine is initiated by a subroutine call from an external computer program).

The specification does not teach a system that requires the license manager to engage in active prevention; rather, it states that the license manager returns a status to the requesting program if no license is available:

> In response to locating the available license in the valid license file, the management system enables the computer program at the selected node to run. If no valid license file is located, or if all valid license files contain licenses that are in use, or unavailable, then *the management system returns a status to the computer program indicating that it is not authorized to run.*

'297 patent, col. 3, ll.27–34 (emphasis added).

Furthermore, both embodiments disclosed in the specification send a message to the program requesting a license from the license manager program and telling the requesting program that it is not authorized to run. *See id.* at col. 16, ll.20, 33, 39 (Appendix A) (providing "Tell computer program it can run" and "Tell computer program that it cannot run" as results of requesting a license from the license manager program); col. 16, ll.61–64 (Appendix B) (setting a status of "authorized to run" or "not authorized to run" and returning it to the requesting program); *see also id.* at Figs. 3, 6. Neither of the disclosed embodiments actively prevents the requesting program from running; rather, each merely sends a signal to the requesting program, which then must shut itself down.

A claim interpretation that excludes a preferred embodiment from the scope of the claim "is rarely, if ever, correct." *Vitronics Corp.*, 90 F.3d at 1583. We construe the claim to require only a message that results in the program's being prevented from running; active prevention is not required.

Thus, the claim construction of the prevent limitation as applied by the district court in its grants of summary judgment of non-infringement, which required the license management means to engage in active prevention, is incorrect. However, the district court's claim construction in its *Claim Construction Order*, which required only that the license management means "return[ ] a run-prevention message," *Claim Construction Order*, slip op. at 16, was correct. There is no contention that there is a lack of a genuine issue of fact with respect to whether LM 5.0 infringes under the district court's (proper) claim construction in its *Claim Construction Order*. Indeed, Greer conceded that LM 5.0 returns a status message.

Although we vacate the district court's grant of summary judgment, we note that a full trial is not necessarily required in this case. The district court retains the discretion to reopen the record for clearer, more specific expert testimony from the parties and to entertain a new summary judgment motion based upon that evidence

under the proper claim construction. *See, e.g., Mass. Bay Transp. Auth. v. United States*, 254 F.3d 1367, 1377 (Fed.Cir.2001). However, the testimony must demonstrate that the witness is using the correct claim construction and address specific alleged acts of infringement and inducement, not conjectures as to what might occur hypothetically.[12]

## CONCLUSION

For the foregoing reasons, we affirm the decision of the district court granting Globetrotter's motion for summary judgment on Greer's counterclaims. We vacate the district court's grant of summary judgment of non-infringement of the '297 patent as to LM 5.0 because there is a genuine issue of material fact as to whether LM 5.0 satisfies the license file means and prevent limitations. Accordingly, we remand to the district court for further proceedings limited to Globetrotter's claims that LM 5.0 infringes claims 3, 23, and 55 of the '297 patent.

*AFFIRMED–IN–PART, VACATED–IN–PART, AND REMANDED*

## COSTS

No costs.

---

**12.** Greer urges us to affirm on other grounds than those upon which the district court relied. We decline to address those issues on appeal, though they remain open in the district court.