KUHN, J.
 

 | gPlaintiff-appellant, Enduracoat Technologies, Inc. (Enduracoat), appeals the trial court’s judgment, granting summary judgment in favor of defendant-appellee, Watson Bowman Acme Corporation (WABO), and dismissing Enduracoat’s claims for damages related to statements a representative of WABO made in a letter to a bidding contractor, TOPCOR Services, Inc. (TOPCOR), in conjunction with services TOPCOR proposed to perform on a project undertaken by the Greater New Orleans Expressway Commission (GNOEC). We affirm.
 

 FACTUAL AND PROCEDURAL BACKGROUND
 

 According to the undisputed facts, in 1995, the GNOEC undertook a project to repair and renovate pilings of the Lake
 
 *1110
 
 Ponchartrain Causeway bridges, identified as Project 1107 of the Lake Ponchartrain Causeway Capital Improvement Plan. The project generally contemplated encasing the pilings supporting the Causeway bridges in fiberglass-reinforced polymer jackets and pumping epoxy and grout into the annulus between the jackets and the pilings. In May 2003, the GNOEC, through its consulting engineers, Krebs, LaSalle, Lemieux Consultants, Inc. (Krebs, LaSalle), put out a request for proposals for Part D of Project 1107. According to the specifications of Project 1107D, WABO’s Advanced Pile Encapsulation (APE) process was the acceptable method for the performance of the piling rehabilitation work;
 
 [1]
 
 however, any bidder ^seeking to use an alternative process could submit its proposal to Krebs, LaSalle for approval as an equal to the APE process. At the time GNOEC let out bidding for Project 1107D, WABO held the licensee rights to the patents issued for the APE process.
 
 [2]
 

 By an addendum to the contract documents of the original bidding documents, on August 14, 2003, Krebs, LaSalle accepted the Enduragrip Pile Encapsulation System (EPE process) belonging to Endura-coat as an approved equal to the APE process.
 
 [3]
 

 TOPCOR was the lowest bidder for Project 1107D. In order to successfully perform the renovation work, TOPCOR had to use an encapsulation process. Prior to completion of the bidding process, on August 25, 2003, WABO’s president sent to TOPCOR a letter stating that it was aware that in its submission bid to the GNOEC, TOPCOR had indicated “it will utilize repair material from [Enduracoat].” After reminding TOPCOR that WABO had recently trained TOPCOR personnel in the APE process for encasing structural members, WABO’s president stated, “we have reason to believe that the process to be used by [TOPCOR] in completion of this job is the same process which was learned from [WABO]. Accordingly, the use of the repair materials of third parties, according to the [APE] trained process, is addressed by [our patents], and would |4not be authorized by license.” The August 25, 2003 letter further requested that if TOPCOR believed the EPE process was not addressed by the APE process patent rights, WABO be provided with an appropriate explanation along with technical information to support its position. The letter concluded, ‘We are confident that a mutu
 
 *1111
 
 ally beneficial business resolution can be swiftly achieved,” and asked TOPCOR’s president to contact WAJBO’s president.
 

 TOPCOR eventually decided to utilize the APE process and submitted a bid in accordance with that decision. Endura-coat filed this lawsuit averring that as a result of the letter, WABO was liable to it based on theories arising under the Lan-ham Act, 15 U.S.C. § 1125(a);
 
 [4]
 
 Louisiana Unfair Trade Practices and Consumer Protection Law, La. R.S. 51:1401-1426;
 
 [5]
 
 and state tort law for loss of a business opportunity, damage to reputation, fraud, and misrepresentation.
 
 [6]
 

 15WABO filed a motion for summary judgment urging no disputed issue of material fact precluded its dismissal from En-duracoat’s lawsuit. After a hearing, the trial court granted WABO’s motion and dismissed all of Enduracoat’s claims.
 
 [7]
 
 This appeal followed.
 

 JURISDICTION
 

 Federal district courts shall have original jurisdiction of any civil action arising under any act of Congress relating to patents. 28 U.S.C. § 1338(a). Such jurisdiction shall be exclusive of the state courts in patent cases.
 
 See
 
 28 U.S.C. § 1338(a). Jurisdiction under this statute extends to any case in which the well-pleaded complaint establishes that plaintiffs right to relief necessarily depends on resolution of a substantial question of federal patent law.
 
 Immunocept, LLC v. Fulbright, LLP,
 
 504 F.3d 1281, 1284 (Fed. Cir.2007). The involvement of a patent question in a suit does not alone confer jurisdiction in the federal courts.
 
 Deats v. Joseph Swantak, Inc.,
 
 619 F.Supp. 973, 981 (N.D.N.Y.1985). Whether a claim “arises under” federal patent law must be determined from what necessarily appears in the plaintiffs statement of his own claim, unaided by anything alleged in anticipation or avoidance of defenses which it is thought the defendant may interpose.
 
 Christianson v. Colt Indus. Operating Corp.,
 
 486 U.S. 800, 809, 108 S.Ct. 2166, 2174, 100 L.Ed.2d 811 (1988). Thus, a case raising a federal patent-law defense does not, for that reason alone, “arise under” patent law, even if the defense is anticipated in the plaintiffs complaint, and even if both parties admit that the defense
 
 *1112
 
 is the only question truly at issue in the case.
 
 Id.
 

 IfiThe proper focus is on whether the plaintiff actually pleaded the elements required by the patent laws for a patent infringement claim,
 
 ie.,
 
 ownership of patent still in force, infringement by defendants, and relief such as treble damages and injunction.
 
 See Kunkel v. Topmaster Int’l, Inc.,
 
 906 F.2d 693, 695 (Fed.Cir.1990).
 

 Based on the allegations of Endu-racoat’s petition, we conclude that plaintiff has not alleged ownership of a patent still in force, an infringement, or relief arising under 35 U.S.C. §§ 283-285.
 
 [8]
 
 Accordingly, we conclude our state courts have jurisdiction to address Enduracoat’s claims.
 

 SUMMARY JUDGMENT
 

 A motion for summary judgment is a procedural device used when there is no genuine issue of material fact.
 
 Duncan v. U.S.A.A. Ins. Co.,
 
 06-0363, p. 3 (La.11/29/06), 950 So.2d 544, 546-47. Appellate courts review summary judgment
 
 de novo,
 
 using the same criteria that govern the trial court’s consideration of whether summary judgment is appropriate.
 
 Costello v. Hardy,
 
 03-1146, p. 8 (La.1/21/04), 864 So.2d 129, 137. A motion for summary judgment should only be granted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to material fact and that the movant is entitled to summary judgment as a matter of law.
 
 See
 
 La. C.C.P. art. 966 B.
 

 The initial burden of proof is with the movant. However, if the movant will not bear the burden of proof at trial on the matter that is before the court on the 17motion for summary judgment, the mov-ant’s burden on the motion does not require him to negate all essential elements of the adverse party’s claim, action, or defense, but rather to point out to the court that there is an absence of factual support for one or more elements essential to the adverse party’s claim, action, or defense. Thereafter, if the adverse party fails to produce factual support sufficient to establish that he will be able to satisfy his evidentiary burden of proof at trial, there is no genuine issue of material fact. La. C.C.P. art. 966 C(2). Once the motion for summary judgment has been properly supported by the moving party, the failure of the non-moving party to produce evidence of a genuine material issue of fact mandates the granting of the motion.
 
 See Babin v. Winn-Dixie Louisiana, Inc.,
 
 00-0078, p. 4 (La.6/30/00), 764 So.2d 37, 40;
 
 see
 
 La. C.C.P. art. 967 B.
 

 An appellate court asks the same questions as does the trial court in determining whether summary judgment is appropriate: whether there is any genuine issue of material fact, and whether the mover is entitled to judgment as a matter of law.
 
 Guardia v. Lakeview Regional Medical Ctr.,
 
 08-1369, p. 3 (La.App. 1st Cir.5/8/09), 13 So.3d 625, 627. Because it is the applicable substantive law that determines materiality, whether a particular fact in dispute is “material” for summary judgment purposes can be seen only in light of the substantive law applicable to the case.
 
 Id.,
 
 08-1369 at p. 4, 13 So.3d at 628.
 

 Alleged infringers have previously challenged a notice of infringement letter sent
 
 *1113
 
 by a competitor to the alleged infringer’s potential customers alleging patent infringement and threatening retaliation.
 
 See GP Indus., Inc. v. Eran Indus., Inc.,
 
 500 F.3d 1369, 1371 (Fed.Cir.2007) (alleged infringer sought a | ^preliminary injunction to prevent competitor from issuing further communications to the alleged infringer’s potential customers alleging product infringement and threatening legal action);
 
 Globetrotter Software, Inc. v. Elan Computer Group, Inc.,
 
 362 F.3d 1367, 1368-70 (Fed.Cir.2004) (alleged infringer pursued various business tort claims, including tor-tious interference with prospective economic advantage and unfair competition, against competitor that had sent communications alleging patent infringement to a potential buyer of the alleged infringer);
 
 Mikohn Gaming Corp. v. Acres Gaming, Inc.,
 
 165 F.3d 891, 893-94 (Fed.Cir.1998) (alleged infringer sought a preliminary injunction to prevent competitor from issuing further communications to customers alleging product infringement and recommending the customers stop using the allegedly infringing systems).
 
 See Contech Stormwater Solutions, Inc. v. Baysaver Technologies, Inc.,
 
 534 F.Supp.2d 616, 630-31 (D.Md.2008).
 

 The law presumes that a patent holder acts in good faith when asserting rights in a duly granted patent.
 
 See Springs Window Fashions LP v. Novo Industries, L.P.,
 
 323 F.3d 989, 999 (Fed. Cir.2003). The presumption of good faith bars a Lanham Act claim unless the complaining party presents affirmative evidence of bad faith on the part of the patent holder.
 
 See Zenith Electronics Corp. v. Exzec, Inc.,
 
 182 F.3d 1340, 1353 (Fed.Cir.1999). In the context of publicizing a patent and communicating in the marketplace an intention to enforce a patent right, federal patent law preempts state-law tort liability for communications so long as those communications are not made in bad faith.
 
 See Globetrotter Software, Inc.,
 
 362 F.3d at 1374-75. | ¡¡Under federal law, a patentee has a right to inform potential infringers of a patent and potentially infringing activity unless the communication is made in bad faith.
 
 GP Indus., Inc.,
 
 500 F.3d at 1374. Thus, when an alleged in-fringer asserts state tort law claims based on assertions of patent infringement, even if it is not generally a required element of the state cause of action, there can be no liability unless the alleged infringer can prove bad faith.
 
 Plasmart, Inc. v. Wincell Int'l Inc.,
 
 442 F.Supp.2d 53, 57 (S.D.N.Y. 2006) (citing
 
 Globetrotter Software, Inc.,
 
 362 F.3d at 1375-77).
 

 To demonstrate bad faith, an alleged infringer must be able to show both that the underlying infringement claim is objectively baseless and that it was asserted with subjective bad faith.
 
 See Globetrotter Software Inc.,
 
 362 F.3d at 1375-77. The “objectively baseless” standard has been defined in the infringement context as it was by the United States Supreme Court in an antitrust action to mean “no reasonable litigant could realistically expect success on the merits.”
 
 Id.
 
 at 1376 (quoting
 
 Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.,
 
 508 U.S. 49, 60, 113 S.Ct. 1920, 123 L.Ed.2d 611 (1993)). Moreover, in performing its analysis, a court should first determine whether an underlying suit is objectively baseless before considering the subjective intent prong because “an objectively reasonable effort to litigate cannot be sham regardless of subjective intent.”
 
 Id.
 
 at 1375-76 (quoting
 
 Prof'l Real Estate Investors,
 
 508 U.S. at 57, 113 S.Ct. 1920);
 
 see Contech Stormwater Solutions, Inc.,
 
 534 F.Supp.2d at 631;
 
 accord Dominant Semiconductors SDN. BHD. v. Osram GMBH,
 
 524 F.3d 1254, 1260 (Fed.Cir.2008). Thus, absent a showing of bad faith, a patent
 
 *1114
 
 holder is entitled to enforce its patent and even threaten litigation | inagainst alleged infringers.
 
 See Golan v. Pingel Enter., Inc.,
 
 310 F.3d 1360, 1370 (Fed.Cir.2002).
 

 No matter how adamantly the complaining party believes them, mere allegations that the patent holder has acted in bad faith will not overcome the presumption of good faith. Instead, the complaining party must “present affirmative evidence sufficient for a reasonable jury to conclude that the [patent holder] acted in bad faith, in light of the burden of clear and convincing evidence that will adhere at trial.”
 
 Springs Window Fashions LP,
 
 323 F.3d at 999. In other words, no bad faith exists unless the patent holder asserts a patent infringement claim upon which “no reasonable litigant could realistically expect” to succeed.
 
 Globetrotter Software, Inc.,
 
 362 F.3d at 1376.
 

 In support of its motion for summary judgment, WABO entered into evidence the deposition testimony of its corporate representative, Ronald Poleon, who was the southeast regional sales manager in August 2003. Poleon explained that in August 2003, Markus Burri was the president of WABO. Burri was the only WABO representative that had direct contact with the patent attorneys on the issue of the potential infringement by Enduracoat’s EPE process. After the addendum to the Project 1107D contract documents was issued on August 14, 2003, approving the EPE process as equal to the APE process, Poleon went on the internet and reviewed the data sheets posted on the Enduracoat website.
 
 [9]
 
 He and ^regional manager, Debbie Steiger, looked at the website and concluded that the EPE process was similar to the APE process. They asked engineering manager, Gary Moore, to review the information on the website and he, likewise, concluded that the two processes were similar.
 

 Poleon estimated that the three WABO employees had reviewed the information posted on the Enduracoat website for about three or four hours. Armed with his understanding of the information he had reviewed, Poleon went to Burri, inquired of the patent status of the APE process, and advised that he, Steiger, and Moore believed the EPE process was similar. Burri told Poleon he would have the patent attorneys examine the two processes.
 

 Poleon explained that, like Enduracoat, WABO also had been interested in securing the use of its process with TOPCOR for Project 1107D. He continued discussions with TOPCOR president, James Baker, but began to suspect that TOPCOR was leaning toward use of the EPE process. Poleon testified that he was never directly advised by Baker that TOPCOR was inclined to use Enduracoat’s process, but as a salesperson, it was his gut feeling.
 

 
 *1115
 
 Poleon spoke again with Burri in the hope of understanding any potential infringement. Despite his curiosity, Poleon was never given direct access to the patent attorneys to discuss the issue or told whether WABO believed there was or was not an infringement. He said that any infringement that Burri and the attorneys came up with was not disclosed to him. Poleon admitted that he never 1 ^personally compared the EPE process with the APE process beyond his observation of the Enduracoat website. Shortly before GNOEC awarded the contract for Project 1107D, Burri told Poleon he would send a letter to TOPCOR, the apparent low bidder, asking whether use of the EPE process may infringe on the patented APE process.
 

 After WABO sent its letter to TOPCOR on August 25, 2003, Poleon testified that Baker never responded to WABO’s request for an explanation. Poleon stated that Baker acknowledged receipt of the letter and indicated that as a small business owner, he was concerned about the possibility of infringing on the APE process patent. Poleon did not know and never suggested to Baker how he could use the EPE process without infringing on the APE process. Poleon told Baker that because the APE patent was a process patent rather than a product patent and that TOPCOR’s use of the process in installing a product would make TOPCOR an infringer.
 
 [10]
 

 In further support of its motion for summary judgment, WABO submitted the deposition testimony of TOPCOR president Baker. According to Baker’s testimony, TOPCOR consulted with Enduracoat through Marcus Bell. TOPCOR wanted Enduracoat to supply its EPE process for the Causeway project. In formulating its August 19, 2003 bid for Project 1107D, Baker contemplated utilizing Enduracoat’s EPE process, subject to the satisfaction of several concerns. Baker first noted that the EPE process needed to get approved as an equal to WABO’s APE process before he could contract with Enduracoat. His second concern was about patent issues. Baker stated that he assumed that the APE 11sprocess was a patented process and knew there was a potential problem with using another process. During the time he was formulating his bid, business associates other than WABO warned him about potential patent infringement problems. Baker stated that he advised Bell about his patent infringement concerns, and Bell told him that Enduracoat had spent a good deal of money investigating the issue and assured him that there were no patent issues. Baker’s third stated concern about entering into a contract with Enduracoat was due to the lack of proven experience of its EPE process.
 

 Baker explained that TOPCOR never entered into a contract with Enduracoat. In August 2003, he received WABO’s letter. He understood WABO’s suggestion that a mutually beneficial resolution could be achieved to mean that WABO wanted TOPCOR to use its APE process. He talked to Bell, who expressed shock and dismay that WABO had sent the letter and indicated that Enduracoat had already covered its bases and was absolutely sure there were no patent issues. But Endura-coat did not effectively address TOPCOR’s concerns. Baker stated that once it appeared the patent issues were not resolved, he told Enduracoat that he would continue his intention of using the EPE process if Enduracoat would indemnify TOPCOR against any patent issues. When Enduracoat refused to indemnify TOPCOR in the event of legal action by WABO, Baker abandoned the idea of using
 
 *1116
 
 the EPE process in favor of the APE process.
 
 [11]
 

 | [4Based on the evidence submitted and our review of the August 25, 2003 letter from WABO’s president to TOP-COR’s president, WABO met its burden of pointing out to the court an absence of factual support for one or more elements essential to Enduracoat’s claim, namely a showing of bad faith. Importantly, Endu-racoat failed to produce factual support sufficient to demonstrate that WABO was unreasonable or unrealistic in its belief that TOPCOR’s use of the EPE process would infringe on its patented APE process. When WABO’s showing is coupled with the presumption of good faith afforded a patent holder asserting rights in a duly granted patent,
 
 see Springs Window Fashions LP,
 
 328 F.3d at 999, Enduracoat simply failed to point out clear and convincing evidence that would allow a reasonable trier of fact to conclude that the patent holder acted in bad faith,
 
 ie.,
 
 evidence showing that WABO asserted a patent infringement claim on which “no reasonable litigant could realistically expect” to succeed. Accordingly, the trial court correctly concluded that WABO is entitled to summary judgment on the issue of bad faith. And because the viability of Lan-ham Act and state-tort liability claims are predicated upon a showing of bad faith, the dismissal of Enduracoat’s lawsuit was proper.
 
 [12]
 

 JjjDECREE
 

 For these reasons, the trial court’s judgment is affirmed. Appeal costs are assessed against Enduracoat Technologies, Inc.
 

 AFFIRMED.
 

 [1]
 

 . Generally, the APE process involves encasing underwater piles in a translucent fiberglass-reinforced polymer jacket and then, using a pleural component pump and separate pressurized lines, pumping epoxy and aggregate to a header located near the subject piles where the epoxy and aggregate are mixed together and the resulting grout mixture is pumped into the fiberglass-reinforced polymer jackets from the bottom up through injection points or loading nipples fabricated onto the sides of the jackets. Throughout the pumping portion of the process, the grout delivery is monitored through the translucent jacket.
 

 [2]
 

 . WABO’s APE process was patented under U.S. Patent Nos. 4,993,876 and 4,892,410.
 

 [3]
 

 .According to the affidavit testimony of Timothy Roberts, a former officer and director of Enduracoat, the EPE process is operated in the same manner as the APE process, however, the EPE process stems from entirely different scientific methods. Noting that the APE process centers on static mixing of die epoxy and grout adjacent to or immediately prior to the injection ports, Roberts explained that the EPE process places the static mixer some distance from the port so as to no longer be adjacent to or immediately prior to the injection ports as demonstrated in the APE patents. As such, Enduracoat maintains that the EPE process was a different system from the APE process.
 

 [4]
 

 .According to the relevant portions of Section 43(a) of the Lanham Act, codified at 15 U.S.C. § 1125(a);
 

 (1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—
 

 (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or
 

 (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.
 

 [5]
 

 . This law declares as unlawful unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce. See La. R.S. 51:1405 A.
 

 [6]
 

 . Enduracoat initially named numerous parties as defendants however all except WABO were ultimately dismissed from this litigation.
 

 [7]
 

 . Enduracoat filed a cross-motion for summary judgment averring entitlement to a judgment concluding that WABO was liable to it for damages, which was denied by the trial court when it granted summary judgment in favor of WABO.
 

 [8]
 

 . 35 U.S.C. § 283 allows courts to grant in-junctive relief to prevent the violation of any right secured by patent; 35 U.S.C. § 284 permits assessments of damage awards, in-eluding treble damages, for infringement in appropriate cases; and 35 U.S.C. § 285 provides for awards of reasonable attorney fees to the prevailing party in exceptional cases.
 

 [9]
 

 . Although Poleon identified the approximate date that he viewed the Enduracoat website as having been in October or November 2003, he testified that the date was immediately after Krebs, LaSalle issued the addendum. While Enduracoat questions the veracity of Poleon’s statements relative to the date he looked at the website, it is clear from his testimony that it was soon after the August 14, 2003 addendum issued. Also we note that in his affidavit, submitted with Enduracoat's cross-motion for summary judgment, Roberts stated, "the only pump displayed on Endura-coat’s website occurred after the bid and sometime after WABO claimed to have seen it,” ostensibly contradicting Poleon's statement that immediately after issuance of the addendum approving the EPE process as an equal, based on his observation of the picture of the pump on the website, it looked identical to the one utilized in the APE process, For purposes of this review, we will assume that a picture of the pump was not on the website when Poleon observed it in August 2003, and that his observations were limited to other posted information, namely the data sheets.
 

 [10]
 

 .
 
 See
 
 35 U.S.C §§ 271 and 281.
 

 [11]
 

 . In its motion for summary judgment, En-duracoat submitted portions of Baker’s testimony indicating that it was "a reasonable assumption” that if TOPCOR had not received WABO’s August 25, 2003 letter it would have used the EPE process for Project 1107D. But read in context, it is clear that Baker's answer was premised on the inference that had WABO not sent the letter, no patent concerns would have existed. A review of the entirety of the deposition testimony makes clear that Baker unequivocally conditioned any contractual arrangement with Enduracoat on resolution of any potential patent issues.
 

 [12]
 

 . Enduracoat applied for a supervisory writ on the trial court's ruling denying its motion for summary judgment. The denial of a motion for summary judgment is an interlocutory judgment, which is not appealable.
 
 See
 
 La. C.C.P. arts. 1841 and 2083;
 
 Louisiana Power and Light Co. v. Slaughter,
 
 04-2361 (La.App. 1st Cir. 11/4/05), 917 So.2d 532,
 
 writ denied,
 
 06-0217 (La.4/24/06), 926 So.2d 550. Our court has addressed interlocutory issues on the appeal of a judgment when they are "identical” to the issues raised in the appeal.
 
 See Dean v. Griffin Crane & Steel, Inc.,
 
 05-1226 (La.App. 1st Cir.5/5/06), 935 So.2d 186,
 
 writ denied,
 
 06-1334 (La.9/22/06), 937 So.2d 387. Because we have concluded the trial court correctly granted WABO’s motion for summary judgment, for the same reasons, we find no error in the trial court's denial of the "identical” issue raised in Enduracoat’s cross-motion for summary judgment.