**Richard A. LOFGREN, Plaintiff,**

v.

**BNSF RAILROAD COMPANY,
a Delaware Corporation,
Defendant.**

Civil No. 4:15–cv–83

United States District Court,
D. North Dakota.

Signed January 25, 2017

Richard L. Carlson, Cortney S. Le-Neave, Hunegs, LeNeave & Kvas, Wayzata, MN, for Plaintiff.

Timothy R. Thornton, Jonathan P. Schmidt, Michael M. Sawers, Briggs & Morgan, Minneapolis, MN, for Defendant.

### ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND DEFENDANT'S AMENDED MOTION FOR SUMMARY JUDGMENT AND MOTION FOR ORAL ARGUMENT

Ralph R. Erickson, District Judge, United States District Court

### INTRODUCTION AND SUMMARY OF DECISION

Before the court is a motion for summary judgment[1], an amended motion for summary judgment[2], and a motion for hearing[3] brought by Defendant, BNSF Railroad Company, a Delaware corporation ("BNSF"), all filed on August 22, 2016. The amended motion for summary

---

1. Doc. # 21.

2. Doc. # 29.

3. Doc. # 28.

judgment[4] is not materially different from the original summary judgment motion, but merely corrects a typographical error containing a wrong name for one of the affiant filings in support of the motion. The original motion[5] is **DISMISSED** as moot. The motion for oral argument[6] is **DENIED** as the court deems argument unnecessary for deciding the motion on the merits.

BNSF argues that it is entitled to summary judgment for two reasons. First, it argues that Lofgren cannot establish that the incident causing his injury was foreseeable. Alternatively, BNSF argues for partial summary judgment on the issue of Lofgren's claim for future wages because of the timing of his "voluntary" retirement.

The amended motion for summary judgment[7] is **DENIED** because there remain genuine issues of material fact and BNSF is not entitled to judgment as a matter of law.

## FACTS

Richard Lofgren began his employment with BNSF in March 1978.[8] During his employment, he worked as a switchman, a brakeman, a hostler, and a conductor.[9] On August 3, 2012, Lofgren was working as a conductor on a train traveling from Glasgow, Montana, to Minot, North Dakota.[10]

The only other member of the crew on the train was the locomotive engineer, Loyall Kauffman.[11]

When the train came into Oswego, Montana, on an approach, it met a grain train.[12] Lofgren's train stopped on the main line while the grain train came from the west onto the siding.[13] While the grain train passed, as the conductor on the stopped train, Lofgren was required to exit the train and complete a "roll-by" inspection.[14] The "roll-by" inspection required Lofgren to inspect the passing train, looking for any potentially dangerous conditions which may require the attention of the passing train's crew.[15] According to BNSF's operating rules: "When a train is stopped and is met or passed by another train, crew members must inspect the passing train. The trainman's inspection must be made from the ground if there is a safe location."[16] The inspecting trainman is to dismount on the side opposite the approaching train and is not to cross adjacent tracks "solely for the purpose of inspecting a passing train."[17] In inclimate weather, the inspection may be made from inside the locomotive cab.[18]

Lofgren was not faced with inclimate weather.[19] He therefore exited the train on the north side, opposite from the ap-

---

4. Doc. # 29.

5. Doc. # 21.

6. Doc. # 28.

7. Doc. # 29.

8. Doc. # 24–1 (Affidavit of Richard Lofgren, taken March 17, 2016), page 20. Note: page references in Doc. # 24–1 are to actual affidavit pages).

9. Doc. # 24–1, pp. 20–21.

10. Doc. # 24–3, p. 5.

11. Doc. # 24–3, p. 6.

12. Doc. # 24–1, p. 35.

13. Doc. # 24–1, p. 35.

14. Doc. # 24–1, p. 35–36.

15. Doc. # 34–4, p. 3, ¶ 6.29.1.

16. Doc. # 34–4, p. 3, BNSF Amendment.

17. Id.

18. Id.

19. Doc. # 24–1, p. 58.

proaching train.[20] When Lofgren dismounted the train, the surface was "really steep" so he moved to "a flat surface and then walked where I felt was a safe place to look at this train that I was meeting." [21] While on the north side of the train he had exited, the oncoming train was approaching on the south side of his train.[22] Lofgren was "approximately maybe five car lengths from our engine to the east on the right-of-way and ... walking, watching the train coming in." [23] After watching the train pass and clear the switch, Lofgren returned to his engine and left.[24]

While returning to his own train after inspecting the passing train, Lofgren stepped in a hole.[25] In his deposition testimony, Lofgren described the incident:

As I was walking back I just felt my heal went down in something, and you can feel like a pinch. So I pulled my foot back up and just kind of kept walking kind of moving my foot back and forth because it felt kind of tight, but it wasn't anything I couldn't walk on.

So I got back up towards the engine and I got back up on the engine on the north side in the door. And we sat down and then we got the clear signal to leave. And as we're leaving I told Loyall, I said, the engineer Loyall Kaufman, I said I stepped in a hole or something out there. And he said well, let's look at it. So I pulled my boot off and my sock and

we looked at it and we didn't really see anything. We could feel it was a little tender. And then we determined it wasn't anything really that serious, so I put my sock and boot back on and we never discussed that again after we left there.[26]

Lofgren could not see exactly what he had stepped in because of the grass in which he was walking.[27]

Lofgren's train tied up in Minot at 12:35 a.m., August 4, 2012.[28] The next day began a scheduled vacation for Lofgren and he and his wife left on a car trip to Oregon.[29] They planned to be gone for two weeks visiting a daughter in Brookings, Oregon.[30] It took three days of driving to reach their destination.[31] After only two days of visiting their daughter, Lofgren's wife, a nurse, decided they needed to return home to North Dakota because Lofgren's heel had become swollen and the pain was intensifying.[32] Lofgren's wife drove on the return trip while Lofgren took Ibuprofen, soaked his foot in ice, and wrapped his foot in an effort to reduce the pain and swelling.[33]

As they got closer to home they contacted the clinic in Kenmare to make an appointment to get medical care.[34] At this time, Lofgren had still not informed anyone at BNSF of the incident or injury. Lofgren thought since he had a month's vacation, he had time to figure out what

**20.** Doc. # 24–1, p. 36.

**21.** Doc. # 24–1, p.36, lines 18–20.

**22.** Doc. # 24–1, pp. 36–37.

**23.** Doc. # 24–1, p. 37, lines 8–10.

**24.** Doc. # 24–1, p. 37.

**25.** Doc. # 24–1, p. 38.

**26.** Doc. 24–1, p.38, lines 5–22.

**27.** Doc. # 24–1, p. 39.

**28.** Doc. # 24–3, p. 21.

**29.** Doc. # 24–3, pp. 21–22.

**30.** Doc. # 24–1, p. 54.

**31.** Doc. # 24–1, p. 53.

**32.** Doc. # 24–1, pp. 54–55.

**33.** Doc. # 24–1, p. 55.

**34.** Doc. # 24–1, p. 55.

was wrong with his foot.[35] In Kenmare, he was examined by his family nurse practitioner, who provided him with a walking boot.[36] The nurse practitioner suspected an Achilles tendon tear because x-rays showed no broken bones.[37] The nurse practitioner referred Lofgren to a podiatrist and directed that he wear the boot until he was able to see a podiatrist.[38] The Lofgrens then continued their vacation by taking a road trip to Minneapolis.[39]

Lofgren failed to report the injury to BNSF until August 24, 2012, after he returned home from Minneapolis.[40]

Lofgren saw the podiatrist on September 13, 2012, which happened to be the same day that he was interviewed by the BNSF claims adjuster.[41] At that interview, Lofgren informed the adjuster that he planned to have his retirement effective in February 2013, and that with his available personal leave days, his last day of employment with BNSF would be December 9, 2012.[42] In his deposition, Lofgren testified that he had intended to retire at age 63,[43] but that after he was informed by his doctor that his injuries would prohibit him from doing the work that he had been doing, he decided to take early retirement, in order to get by financially.[44] When asked about his claimed losses, Lofgren stated:

> Well, I'm going to be really honest with everybody here. When I, when I went in with the claim agent we sat down and he, we talked about my injury. And I told him that my doctor disabled me. And he said well, are you going to

retire when you hit 60. I said yes, I am. He said we'll take care of you at that time. And I said well, what do you do in between that. He said Burlington Northern does not like to dish out money at this point, he said but we'll make everything right with you when you sign them papers. I said okay.

> I was 59 and a half, so I was lucky enough that I was 59 and a half, I could get into my 401(k) and take, steal a little money out of that until I hit 60. I signed the papers up, retired. I was going to go for the disability but the claim, or the agent in Fargo railroad retirement said you're better off waiting if you can afford it until you hit 60 and take a regular retirement, she said that way with the cost of living raises you don't have to worry about that stuff, you keep getting them, so I did that.

> I called up Mike Voigt, the train member, the claim agent, we discussed what we had discussed before. I said I am retiring now, I'm signing the papers, you know, we can settle up. He said I'm not going to settle up with you, for all I care they can put you together with duct tape. And that was the last time I talked to him. What I said then, I said well, I thought we were going to settle this up. He said I can't settle this up, he said they'll have a field day with me. And that's I didn't understand that. I said okay, thank you. And that was the last time we corresponded with him.

> . . .

**35.** Doc. # 24–1, p. 56.

**36.** Doc. # 24–3, pp.23–24.

**37.** Doc. # 24–3, p. 24.

**38.** Doc. # 24–3, p. 24.

**39.** Doc. # 24–3, p. 23.

**40.** Doc. # 24–1, p. 73.

**41.** Doc. # 24–3, p. 24.

**42.** Doc. # 24–3, p. 3.

**43.** Doc. # 24–1, p. 31.

**44.** Doc. # 24–1, p. 62.

And I never had a lawyer hired at that time, I took that as his word, and after that then I proceeded to get a lawyer.[45]

BNSF alleges that the delay in reporting the incident inhibited its ability to properly investigate the incident.[46] In the last week of August 2012, a fire went through the area of the East Oswego switch area, consuming much of the vegetation.[47] There is evidence in the record that BNSF was never given notice of a concern regarding the walking conditions for employees working at the Oswego location.[48] Some evidence puts into question whether Lofgren was required to stray from the appropriate walkway in order to have stepped in tall grass.[49] Evidence in the record indicates that, although BNSF had not published "best-practices" instructions for doing roll-by inspections, trainmen were expected to use their best judgment and not veer too far away from the tracks, while maintaining a safe distance from the passing train.[50]

## DISCUSSION

■ "Summary judgment is proper if the evidence, viewed in the light most favorable to the nonmoving party, demonstrates that no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law."[51] This court is required to grant summary judgment "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."[52] "A jury question is presented under FELA when a reasonable conclusion may be drawn that the employer's negligence played any part in the employee's injury.[53] The court will not decide credibility of testimony or weigh the evidence in ruling on a motion for summary judgment.[54]

1. **Whether Lofgren has proffered sufficient evidence to establish a genuine issue of material fact on the essential element of foreseeability.**

In enacting the Federal Employers' Liability Act ("FELA"), 45 U.S.C. § 51, *et seq.*, Congress has provided that railroads engaged in interstate commerce are liable for injuries to their employees under certain circumstances. Specifically, FELA provides that a carrier is liable to an employee "for such injury or death resulting

45. Doc. # 24–1, p 25, line 14, to p. 26, line 24.

46. Doc. # 25 (Affidavit of William J. McFadden), ¶ 3.

47. Id.

48. Doc. # 24–8, (Deposition of Robert A. Rindy), p. 22.

49. Doc. # 24–8, pp. 32–24.

50. Doc. # 24–10 (Affidavit of Erich Linser), at pp. 20–26.

51. Fisher v. Wal–Mart Stores, Inc., 619 F.3d 811 (8th Cir. 2010)

52. Duluth, Winnipeg and Pacific Railway Co. v. City of Orr, 529 F.3d 794, 797 (8th Cir. 2008) (citing Erenberg v. Methodist Hosp., 357 F.3d 787, 792 (8th Cir. 2004)).

53. Vidlak v. Burlington Northern Railroad, 16 F.3d 1229, Unpublished Disposition, (8th Cir. 1993) (citing Rogers v. Missouri Pac. R.R. Co., 352 U.S. 500, 506–07, 77 S.Ct. 443, 1 L.Ed.2d 493 (1957)).

54. In re Wholesale Grocery Products Antitrust Litigation, 752 F.3d 728 (8th Cir. 2014) ((citing Coker v. Ark. State Police, 734 F.3d 838, 843 (8th Cir. 2013) ("Making credibility determinations or weighing evidence in this manner is improper at the summary judgment stage.")).

in whole or in part from the negligence of any of the officers, agents, or employees of such carrier, or by reason of any defect or insufficiency, due to its negligence, in its cars, engines, appliances, machinery, track, roadbed, works, boats, wharves, or other equipment."[55] Contributory negligence is not a bar to recovery, but "damages shall be diminished by the jury in proportion to the amount of negligence attributable to such employee."[56] However, "no such employee who may be injured or killed shall be held to have been guilty of contributory negligence in any case where the violation by such common carrier of any statute enacted for the safety of employees contributed to the injury or death of such employee."[57] In an action brought under FELA, an employee "shall not be held to have assumed the risks of ... employment in any case where such injury ... resulted in whole or in part from" employer negligence.[58]

 The "proximate cause" standard applied in most common law tort actions does not apply in FELA cases.[59] "Juries in such cases are properly instructed that a defendant railroad 'caused or contributed to' a railroad worker's injury 'if [the railroad's] negligence played a part—no matter how small—in bringing about the injury.'"[60]

 An "essential" ingredient of a railroad's negligence is reasonable foreseeability of harm.[61] "The jury, therefore, must be asked, initially: Did the carrier 'fai($l$) to observe that degree of care which people of ordinary prudence and sagacity would use under the same or similar circumstances(?).'"[62] The Eighth Circuit Court of Appeals recognizes:

> Although FELA does not incorporate common law "proximate causation," reasonable foreseeability of harm is an essential ingredient of FELA negligence. ... Reasonable foreseeability circumscribes the duties a railroad owes its employees. ... Where a railroad "has no reasonable ground to anticipate that a particular condition ... would or might result in a mishap and injury, then the [railroad] is not required to do anything to correct [the] condition." ... Provided that negligence is proved, no matter how insignificant its role in producing the injury, "the manner in which [the injury] occurred" need not be foreseeable.[63]

Pursuant to its authority under 49 U.S.C. §§ 20102–20114 and 20142, the Department of Transportation has issued regulations requiring that railroads control "vegetation on railroad property which is on or immediately adjacent to roadbed ..."[64] The regulations specifically require that vegetation be controlled for various

---

**55.** 45 U.S.C. § 51.

**56.** 45 U.S.C. § 53.

**57.** Id.

**58.** 45 U.S.C. § 54.

**59.** CSX Transportation, Inc. v. McBride, 564 U.S. 685, 699, 131 S.Ct. 2630, 180 L.Ed.2d 637 (2011) (affirming an understanding of Rogers v. Missouri Pacific R. Co., 352 U.S. 500, 77 S.Ct. 443, 1 L.Ed.2d 493 (1957) that was "accepted as settled law for several decades").

**60.** Id. at 705, 131 S.Ct. 2630.

**61.** Id. at 703, 131 S.Ct. 2630.

**62.** Id. at 703, 131 S.Ct. 2630 (citing Gallick v. Baltimore & Ohio R. Co., 372 U.S. 108, 118, 83 S.Ct. 659, 9 L.Ed.2d 618 (1963)).

**63.** Burckhard v. BNSF Railway Co., 837 F.3d 848, 853–54 (8th Cir. 2016) (citing CSX Transp., Inc. v. McBride, 564 U.S. 685, 702–04, 131 S.Ct. 2630, 180 L.Ed.2d 637 (2011)).

**64.** 49 C.F.R. § 213.37.

reasons, including specifically to prevent interference with "railroad employees performing normal trackside duties" and to make sure the vegetation does not prevent the employees "from visually inspecting moving equipment from their normal duty stations." [65]

▮ The court is unable to conclude from the record that BNSF could not foresee the possibility of injury to an employee performing his duties at the Oswego location. There is conflicting evidence as to the conditions of the available working space, including its steepness and the existence or nonexistence of hazardous vegetation. The record does not show that BNSF complied with 49 C.F.R. § 213.37 as a matter of law. These issues can be resolved only by assigning weight and credibility to the evidence, an exercise that is inappropriate for the court when deciding a motion for summary judgment.

The court is not in a position to decide that a jury would be unreasonable in concluding that BNSF was negligent and that its negligence played some part, however small, in Lofgren's injury. Summary judgment is inappropriate.

2. **Whether Lofgren has presented sufficient admissible evidence to create a genuine issue of material fact as to his entitlement to damages related to future wage loss.**

▮ There is conflicting evidence in the record concerning Lofgren's retirement plans. The court is not in a position to decide that issue without making decisions as to the weight and credibility of the evidence. Those decisions are not appropriate for summary judgment but are particularly suited for the jury. BNSF has not shown the absence of a genuine issue of

material fact or that it is entitled to judgment as a matter of law on this issue.

## DECISION

BNSF's amended motion for summary judgment is **DENIED**. The original motion for summary judgment [66] is **DENIED** as moot. The motion for oral argument [67] is **DENIED** as argument is unnecessary.

**IT IS SO ORDERED.**