# United States Court of Appeals

## For the Eighth Circuit

_____

No. 13-1297

_____

In re: Wholesale Grocery Products Antitrust Litigation

_____

D&G, Inc., doing business as Gary's Foods

*Plaintiff - Appellant*

DeLuca's Market Corp.

*Plaintiff*

v.

SuperValu, Inc.; C&S Wholesale Grocers, Inc.

*Defendants - Appellees*

_____

American Antitrust Institute

*Amicus Curiae*

_____

Appeal from United States District Court
for the District of Minnesota - Minneapolis

_____

Submitted: November 21, 2013
Filed: May 21, 2014
_____

Before RILEY, Chief Judge, BRIGHT and KELLY, Circuit Judges.
_____

RILEY, Chief Judge.

This antitrust case pits a small town, family-owned grocery store against the two largest grocery wholesalers in the United States. D&G, Inc., operates the Gary's Foods store in Mount Vernon, Iowa. In 2003, D&G's wholesaler, SuperValu, Inc., agreed to a geographic asset exchange with C&S Wholesale Grocers, Inc., and its subsidiaries. SuperValu took the Midwest, while C&S took New England. According to D&G's expert, the asset exchange agreement expectedly would increase wholesale prices in the Midwest. Unsurprisingly, the wholesalers and their expert disagree. D&G sued the wholesalers under the first section of the Sherman Act, 15 U.S.C. § 1, and the fourth section of the Clayton Act, 15 U.S.C. § 15(a), and moved for class certification. The district court denied the certification motion and, on cross-motions for full and partial summary judgment, granted summary judgment to the wholesalers. D&G appeals. We affirm in part, reverse in part, vacate in part, and remand.

## I.    BACKGROUND
### A.    Factual History

C&S and SuperValu are the two largest grocery wholesalers in the United States. Grocery wholesalers are a critical link in the grocery supply chain, purchasing thousands of products directly from manufacturers and suppliers before distributing them to retailers. "Partial-line" wholesalers specialize in a handful of specialty product categories, while "full-line" wholesalers like C&S and SuperValu distribute tens of thousands of products spanning every category. To stock the thousands of

products Americans expect to find in their local grocery store, small retailers like D&G need one full-line wholesaler in addition to partial-line wholesalers and direct suppliers.

Before June 2002, SuperValu was C&S's "largest" and "closest" competitor in New England, where C&S was the primary wholesaler. C&S did not compete at all with SuperValu in the Midwest, where SuperValu was the dominant wholesaler. In June 2002, C&S acquired a distribution center in Ohio dedicated to serving a regional grocery chain, and eyed expansion into the rest of SuperValu's Midwestern market. Less than a year later, SuperValu's main competitor in the Midwest, Fleming Companies, filed for bankruptcy. SuperValu submitted a regional bid for Fleming's Midwestern business, but C&S announced its intention to acquire Fleming's wholesale assets nationwide, positioning C&S to become SuperValu's top competitor in the Midwest. When this news became public, MarketWatch reported SuperValu's stock price "tumbl[ed] . . . as investors worried that a stronger rival was stepping into the wholesale grocery picture." SuperValu Subtracts 8% as Competition Heats Up, MarketWatch (June 30, 2003, 11:25 AM), http://www.marketwatch.com/story/ supervalu-subtracts-8-as-competition-heats-up.

Even as C&S and Fleming negotiated, SuperValu was involved in negotiations of its own—with C&S. In May 2003, C&S formally offered to acquire SuperValu's entire wholesaling operation in New England. On July 7, 2003, C&S and Fleming reached a final agreement, allowing C&S, if it so chose, to designate a third party to acquire Fleming's Midwestern assets. On July 20, 2003, C&S executive vice president Mark Gross informed SuperValu senior corporate counsel Sheila Hagen, by e-mail, that C&S and SuperValu "ha[d] always been discussing your *departure from New England. No carve-outs.* The purchase price/swap *only makes sense with your departure.*" (Emphasis added). Hagen replied, indicating SuperValu's willingness "to discuss the issue of New England sales w/ [sic] you." The following morning, Gross replied:

-3-

> We are not interested in a transaction that *leaves Supervalu in New England*. . . . [W]e *have been discussing this for months. This is the basis of the deal.* Finally, you should look at [the letter of intent], it says *you won't compete with us in New England.*

(Emphasis added).

In September 2003, the two wholesalers reached an agreement: C&S agreed to designate SuperValu to receive Fleming's Midwestern assets, and in exchange SuperValu agreed to transfer all of its New England assets to C&S. The agreement also contained reciprocal non-compete provisions. C&S agreed not to sell without SuperValu's prior approval to certain former Fleming customers in the Midwest for two years and not to solicit business from any of those customers for five years. SuperValu, meanwhile, agreed not to sell, without C&S's prior approval, to any of its former New England customers for two years and not to solicit their business for five years.

The parties generally agree that the written terms of the non-compete provisions were limited to *former* customers in the regions, theoretically permitting each wholesaler to compete for the business of each other's *new* and *existing* customers. But, if D&G's evidence is believed, the two wholesalers conformed more closely to the sentiment expressed in Gross's e-mails—the "basis of the deal" being SuperValu's promise not to "compete . . . in New England"—than to the letter of the agreement. SuperValu sought no customers in New England—new, former, or existing—and in the Midwest C&S supplied only two customers whose operations spanned several geographic regions.

Shortly after completing the transaction, both wholesalers closed all the distribution centers they had acquired through the deal. SuperValu's market share in

the Midwest increased from 40% to 65%, and the market concentration[1] of the Midwestern wholesale grocery market almost doubled. According to D&G's expert, this increase in market concentration was ten times the amount deemed "likely to create or enhance market power" by the Department of Justice (DOJ) and Federal Trade Commission (FTC), the agencies charged with enforcing federal antitrust laws.

Until August 2005, SuperValu was D&G's full-line wholesale supplier. SuperValu charged D&G using a pricing formula called "activity based sell" (ABS). According to D&G, almost all SuperValu customers in the Midwest were subject to the ABS formula. The ABS price varied by product and distribution center, such that D&G would pay more for the same product if supplied from SuperValu's Minnesota distribution center than if supplied from SuperValu's center in Illinois. Before the beginning of the putative class period (December 31, 2004), D&G convinced SuperValu to change its supply center from Minnesota to Illinois.

Despite the change in supply centers, D&G's evidence indicates that its costs actually rose. During the class period, D&G's ABS fees increased thirty basis points. According to economic analysis conducted by D&G's expert, SuperValu's gross profit margins at the Illinois center were higher than possible in a competitive market, increasing seventy basis points following the agreement with C&S during a period when profits fell at the SuperValu centers that competed with C&S.

### B. Procedural History

On December 31, 2008, D&G filed a class action complaint in the Western District of Wisconsin against the wholesalers. The wholesalers moved pursuant to 28 U.S.C. § 1404(a) to transfer venue to the District of Minnesota. On April 24,

---

[1]Market concentration, typically measured using the Herfindahl-Hirschman Index, is a function of (1) the number, and (2) respective market shares of firms in a given market. See U.S. Dep't of Justice & Federal Trade Comm'n, Horizontal Merger Guidelines § 5.3 (2010).

2009, the Wisconsin district court granted the motion. In the meantime, other plaintiffs filed similar complaints against the wholesalers in the Districts of New Hampshire, Northern Illinois, and Minnesota. On October 16, 2009, the U.S. Judicial Panel on Multidistrict Litigation ordered centralization in the District of Minnesota pursuant to 28 U.S.C. § 1407. After D&G[2] amended its complaint, the centralized litigation elicited a flurry of motions.

First, the wholesalers moved to dismiss under Federal Rule of Civil Procedure 12(b)(6), and D&G moved for partial summary judgment, arguing the wholesalers' non-compete agreement was a *per se* violation of 15 U.S.C. § 1. The district court agreed with the wholesalers that the four-year statute of limitations precluded claims accruing before December 31, 2004—four years before the first complaint was filed—but denied the motion to dismiss. The district court also denied D&G's partial summary judgment motion, reasoning "outstanding issues regarding the per se rule and ancillarity" precluded summary judgment.

Second, the wholesalers moved to strike D&G's expert report under <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579 (1993), while D&G moved under Fed. R. Civ. P. 23 to certify a "Midwest Class" consisting of SuperValu customers in the Midwest region. The district court denied both motions, believing that even with the expert report D&G lacked common evidence to show class-wide impact. Because SuperValu used "formulaic" ABS pricing, D&G made "a better case for certification of the Midwest Class than the New England class." But the district court nonetheless denied certification because D&G could not "articulate a method for showing *with the same evidence* that ABS fees were inflated" for all putative class members.

---

[2]Although the underlying antitrust litigation involves multiple plaintiffs, D&G is the only one at issue in this appeal. <u>Cf.</u> <u>In re Wholesale Grocery Prods. Antitrust Litig.</u>, 707 F.3d 917, 919 (8th Cir. 2013) (reversing "the district court's ruling that equitable estoppel bars" other plaintiffs "from asserting antitrust claims in federal court").

Although SuperValu used the same ABS formula across the Midwest, each distribution center plugged different values into the formula, requiring "an analysis of each distribution center's fees and . . . competitive conditions."

Third, in response to the denial of class certification, D&G sought leave to file a revised class certification motion limiting the putative class to SuperValu customers supplied from the Champaign, Illinois, distribution center, meaning the ABS formula inputs would be the same for all class members. D&G also moved for partial summary judgment, arguing the wholesalers committed a *per se* antitrust violation, while the wholesalers moved for "targeted summary judgment" based "on a single dispositive issue: there is no evidence that [D&G] suffered injury from [the wholesalers'] alleged antitrust violation." D&G opposed the wholesalers' motion and moved to defer consideration under Federal Rule of Civil Procedure 56(d), asserting their expert needed more time.

The district court denied D&G's motions, granted the wholesalers' motion, and denied as moot the revised class certification request. Relying on its earlier decision, the district court again found no reason to treat the non-compete agreement as a *per se* antitrust violation. Instead, moving somewhat beyond the "targeted" motion filed by the wholesalers, the district court not only found D&G failed to establish injury (the subject of the motion), but also found D&G failed to define the relevant market—something D&G's filings in response to the "targeted" motion had no reason to address. D&G timely appeals, invoking our jurisdiction under 28 U.S.C. § 1291.

## II.    DISCUSSION

We review the district court's summary judgment orders "*de novo*, viewing the record in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor." Bishop v. Glazier, 723 F.3d 957, 960-61 (8th Cir. 2013). Although the Supreme Court, long ago, hinted summary judgment should be rare in antitrust cases "where motive and intent play leading roles," Poller v.

Columbia Broad. Sys., Inc., 368 U.S. 464, 473 (1962), it is now beyond debate that "the Supreme Court would find an error of law in the imposition of a heightened standard for summary judgment in a complex antitrust case." City of Mt. Pleasant, Iowa v. Associated Elec. Co-op., Inc., 838 F.2d 268, 274 (8th Cir. 1988).[3]

We apply the same standard—whether the record reveals a genuine dispute of material fact—to antitrust and non-antitrust cases alike, neither favoring nor disfavoring summary judgment, but simply following the evidence (or lack thereof) and the law wherever they lead. See Fed. R. Civ. P. 56(a); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 598 (1986) (explaining, in a complex antitrust case, that without a "'genuine issue for trial,' . . . petitioners are entitled to . . . summary judgment" (quoting a prior version of Fed. R. Civ. P. 56(e)).[4]

The district court's other decisions at issue involve exercises of discretion, which we review for abuse. See, e.g., Luiken v. Domino's Pizza, LLC, 705 F.3d 370, 372 (8th Cir. 2013) (reviewing class certification decision for abuse of discretion);

---

[3]To the extent some of our more recent cases have, without explanation, perpetuated dicta that district courts should rarely enter summary judgment in antitrust cases, see, e.g., HDC Med., Inc. v. Minntech Corp., 474 F.3d 543, 546 (8th Cir. 2007), this dicta must be rejected as inconsistent with Judge Richard S. Arnold's cogent analysis, and binding prior-panel opinion in Associated Electric, 838 F.2d at 273-74. See Mader v. United States, 654 F.3d 794, 800 (8th Cir. 2011) (en banc).

[4]Surprisingly, it appears our adherence to the unadorned text of Rule 56(a) places us at odds with two other circuits—inconsistent with each other as well as inconsistent with our circuit. Compare PepsiCo, Inc. v. Coca-Cola Co., 315 F.3d 101, 104 (2d Cir. 2002) (per curiam) ("In the context of antitrust cases . . . summary judgment is *particularly favored* because of the concern that protracted litigation will chill pro-competitive market forces." (emphasis added)), with Thurman Indus., Inc. v. Pay 'N Pak Stores, Inc., 875 F.2d 1369, 1373 (9th Cir. 1989) ("[T]his circuit generally *disfavors* summary judgment in antitrust cases.") (emphasis added)).

Chambers v. Travelers Cos., 668 F.3d 559, 568 (8th Cir. 2012) (reviewing Fed. R. Civ. P. 56(d) continuance decision for abuse of discretion).

### A. Summary Judgment

The critical issue in this appeal is whether the record evinces a "genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). Both sides cloud the issue in an effort to convince us to rule, as a matter of law, in their favor: D&G's brief recasts this simple question into two issues with three sub-issues, while the wholesalers' brief splits the question into two and a half issues. We decline the parties' invitations to ensnare this appeal in legal and factual minutiae which are not relevant to the outcome.

### 1. *Per Se* Violation

D&G confuses the real issue by arguing the undisputed evidence establishes a *per se* violation of the antitrust laws. The district court treated this as a purely legal question and looked solely at the written terms of the wholesalers' non-compete agreement. This approach understandably led the district court to deny D&G's partial motion for summary judgment because, by its plain terms, the non-compete agreement is not a pure, horizontal division of customers or geographic territories. Cf., e.g., Palmer v. BRG of Ga., Inc., 498 U.S. 46, 50 n.6 (1990) (per curiam) ("'[D]ivision of markets' is [a] *per se* offense." (quoting Arizona v. Maricopa Cnty. Med. Soc'y, 457 U.S. 332, 344, n.15 (1982))). The district court erred by assuming that because the record did not establish an undisputed *per se* violation, then the rule of reason necessarily applied.

For the same reason D&G was not entitled to summary judgment on the *per se* violation question, the wholesalers are not entitled to a summary determination that their agreement deserves rule-of-reason scrutiny: a material, genuine factual dispute exists. See Fed. R. Civ. P. 56(a). To be sure, "'the selection of a mode [of analysis] is entirely a question of law.'" Craftsmen Limousine, Inc. v. Ford Motor Co., 363

F.3d 761, 772 (8th Cir. 2004) (alteration in original) (quoting Phillip E. Areeda & Herbert Hovenkamp, <u>Antitrust Law</u> ¶ 1909b (1998)).  But underpinning that purely legal decision are numerous factual questions.

The crucial factual question here: What are the terms of the allegedly anticompetitive agreement?  Perhaps there are aspiring monopolists foolish enough to reduce their entire anticompetitive agreement to writing, which would make the answer easy.  But most would-be monopolists probably can be expected to display a bit more guile, jotting down only a few seemingly common terms while sealing their true anticompetitive agreement with a knowing nod and wink.  If D&G's evidence is accepted, that is what happened here.

It is true, as the district court correctly noted, that the written non-compete agreement applied to former customers, theoretically permitting the wholesalers to compete for the existing and future customers.  But this is not a contracts case in which the scope of the alleged anticompetitive agreement is cabined by the four corners of the written document.  Not confined by the parol evidence rule, D&G could use all manner of extrinsic evidence to persuade a jury that what the wholesalers *actually agreed to* was a naked division of territory and customers.  And the record contains enough evidence, viewed in the light most favorable to D&G, potentially to convince a reasonable jury of this fact.

Tellingly, although the written non-compete agreement permitted the wholesalers to compete in each other's regions for new and existing customers, *neither one actually did so*.  Also revealing are e-mails, written by C&S's executive vice president, indicating "the basis of the deal" was that SuperValu would "depart[] from New England" and "wo[uld]n't compete with [C&S] in New England" and C&S was "not interested in a transaction that leaves SuperValu in New England." Considering these pieces of evidence along with D&G's other evidence, a reasonable

-10-

jury could conclude the wholesalers' real agreement involved dividing territory and customers along geographic lines.

If a reasonable jury were to make this factual finding, then the wholesalers committed a *per se* antitrust violation.[5] See, e.g., Leegin Creative Leather Prods., Inc. v. PSKS, Inc., 551 U.S. 877, 886 (2007) ("Restraints that are *per se* unlawful include horizontal agreements among competitors to . . . divide markets."); Palmer, 498 U.S. at 49 ("[A]greements between competitors to allocate territories to minimize competition are illegal [and] . . . '*per se* violations of the Sherman Act.'" (quoting United States v. Topco Assocs., Inc., 405 U.S. 596, 608 (1972))); Nitro Distrib., Inc. v. Alticor, Inc., 565 F.3d 417, 423 (8th Cir. 2009) ("[C]ustomer allocation agreements are among the 'most elementary' violations [of the Sherman Act,] and are generally subject to a *per se* analysis." (quoting Hammes v. AAMCO Transmissions, Inc., 33 F.3d 774, 782 (7th Cir. 1994))).

This case is similar to Hammes, where then-Chief Judge Richard Posner summed up the decisive point this way:

> The allocation of . . . customers among the dealers by means of automatic call forwarding from phantom dealers supposedly located in the borderline areas could eliminate competition for customers who, not being within the gravitational field of any dealer by reason of proximity, would, were it not for the allocation, have a real and not merely theoretical choice between dealers. Such an out-and-out scheme of customer allocation would be a *per se* violation of section 1. Of course

---

[5]Because a jury, after hearing evidence from both sides, must first answer the underlying factual questions, obviously we express no view at this stage whether the wholesalers actually committed any antitrust violation—*per se* or otherwise. See, e.g., Atkinson v. City of Mountain View, Mo., 709 F.3d 1201, 1211 (8th Cir. 2013) ("Which [side's] story is more plausible we cannot say because 'it is not our function to remove the credibility assessment from the jury.'" (quoting Kukla v. Hulm, 310 F.3d 1046, 1050 (8th Cir. 2002))).

*we do not yet know* whether this is the character of the [allegedly anticompetitive] call-forwarding scheme.

Hammes, 33 F.3d at 782. Just as Hammes presented a factual dispute about the nature of the alleged scheme, this case presents a factual dispute about the real terms of the wholesalers' agreement. This genuine and material factual dispute prevents summary judgment as to whether a *per se* violation occurred. See Fed. R. Civ. P. 56(a).

### 2.    Rule of Reason

The wholesalers confuse the summary judgment analysis by contending that since the undisputed facts do not necessarily prove a *per se* violation, they are entitled to summary judgment under the rule of reason. The district court agreed for a reason not addressed by the wholesalers' summary judgment motion. Because the wholesalers' "targeted" motion never argued the market was undefined, D&G had no reason to rebut this unraised argument. Yet the district court granted summary judgment based on a finding that D&G had not properly defined the relevant market. This was error. See Fed. R. Civ. P. 56(f)(2) (permitting *sua sponte* entry of summary judgment only "[a]fter giving notice and a reasonable time to respond").

In any event, summary judgment was not warranted because D&G submitted enough evidence to create a genuine factual dispute about (1) the relevant market and (2) the injury caused by the wholesalers' alleged antitrust violation. See HDC Med., 474 F.3d at 547 ("The relevant product market is a *question of fact*." (emphasis added)); Sw. Suburban Bd. of Realtors, Inc. v. Beverly Area Planning Ass'n, 830 F.2d 1374, 1381 (7th Cir. 1987) ("[E]stablishing antitrust injury involves complex *questions of fact*." (emphasis added)). The district court appears to have weighed the evidence, questioning the conclusions of D&G's expert. "Making credibility determinations or weighing evidence in this manner is improper at the summary judgment stage." Coker v. Ark. State Police, 734 F.3d 838, 843 (8th Cir. 2013). A

reasonable jury, after viewing the expert testimony and weighing D&G's evidence that wholesale prices increased as a result of the non-compete agreement, could disagree with the district court and find D&G's expert persuasive and credible.[6]

For these reasons, neither side is entitled to summary judgment—partial or "targeted"—and this case should be tried to a jury following any further pretrial discovery and proceedings on remand.[7]

## B.    Class Certification

On the second issue, we will not disturb the district court's denial of class certification for *all* SuperValu customers in the Midwest region. Class certification, after all, is discretionary. See Avritt v. Reliastar Life Ins. Co., 615 F.3d 1023, 1029 (8th Cir. 2010). A district court abuses its discretion in this context only if it "rests its conclusion on clearly erroneous factual findings or if its decision relies on erroneous legal conclusions." Wedow v. City of Kan. City, Mo., 442 F.3d 661, 676 (8th Cir. 2006) (internal quotation omitted). Although D&G makes a plausible

---

[6]Our conclusion that the district court erred in granting summary judgment on the merits moots the challenge to the district court's denial of D&G's request for a continuance under Rule 56(d).

[7]Because the ultimate question whether *per se* or rule of reason analysis applies is one of law, we expect the district court will present the jury with factual interrogatories detailed enough to enable the court to make this choice. See Fed. R. Civ. P. 49; cf., e.g., Allied Tube & Conduit Corp. v. Indian Head, Inc., 486 U.S. 492, 498 (1988) ("In answers to special interrogatories, the jury found . . . . that petitioner's actions had an adverse impact on competition, were not the least restrictive means of expressing petitioner's opposition to the use of [a certain product] in the marketplace, and unreasonably restrained trade in violation of the antitrust laws."); Baxley-DeLamar Monuments, Inc. v. Am. Cemetery Ass'n, 938 F.2d 846, 849 (8th Cir. 1991) ("In its answer to special interrogatories, the jury found that there was no conspiracy among the defendants either to commit illegal tying (section 1) or to monopolize the installation market (section 2).").

argument that small variations in ABS fee inputs among Midwestern distribution centers do not prevent classwide damage calculations, the district court did not abuse its discretion in finding otherwise.  See id.

We do vacate the denial of D&G's request to certify a narrower class of SuperValu customers who were charged according to the ABS formula and supplied from Champaign, Illinois.  Although the evidence suggests the ABS fee inputs would be standardized for this narrow class, at this stage we decline to opine whether "questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3).  We merely request the district court to consider, in light of our holding that the wholesalers are not entitled to summary judgment, whether to certify this class.

## C.    Statute of Limitations

On the final issue, we agree with the district court that 15 U.S.C. § 15b does not render D&G's claims untimely.

The timeliness question in this case is controlled by Klehr v. A.O. Smith Corp., 521 U.S. 179 (1997).  In Klehr, the Supreme Court explained that "in the case of a continuing violation," "each overt act that is part of the violation and that injures the plaintiff, *e.g.*, *each sale to the plaintiff*, starts the statutory period running again, regardless of the plaintiff's knowledge of the alleged illegality at much earlier times." Id. at 189 (internal quotations omitted) (emphasis added).  Under D&G's theory of the case, the anticompetitive nature of the wholesalers' agreement was not revealed until several years after the asset exchange.  Even though the written non-compete agreement generally left the wholesalers free to compete for new and existing customers, it was not apparent until later that the wholesalers' real agreement was (according to D&G's evidence) a blatant market division.

-14-

If the wholesalers' logic were accepted, two parties could agree to divide markets for the purpose of raising prices, wait four years to raise prices, then reap the profits of their illegal agreement with impunity because any antitrust claims would be time barred. That is not the law. Under Klehr, a monopolist commits an overt act each time he uses unlawfully acquired market power to charge an elevated price. See id. Although "the commission of a separate new overt act generally does not permit the plaintiff to recover for the injury caused by old overt acts outside the limitations period," the plaintiff is entitled to recover for any discrete overt act occurring *within* the limitations period. Id. at 189-90. The limitations period begins to run against customers only when the "customers *have reason to know* of the violation and their damages are *sufficiently ascertainable* to justify an antitrust action." Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 320c4, at 303-04 (3d ed. 2007) (emphasis added). In this case, the Clayton Act's four-year limit does not preclude D&G from recovering for inflated prices charged within the four years before D&G's December 31, 2008, complaint. See Klehr, 521 U.S. at 189-90.

## III.   CONCLUSION

We affirm in part, reverse in part, vacate in part, and remand for further proceedings consistent with this opinion.

---