# United States Court of Appeals
## For the Eighth Circuit

_____

No. 18-3167

_____

Inline Packaging, LLC

*Plaintiff - Appellant*

v.

Graphic Packaging International, LLC

*Defendant - Appellee*

_____

Appeal from United States District Court
for the District of Minnesota

_____

Submitted: October 17, 2019
Filed: June 18, 2020

_____

Before SMITH, Chief Judge, GRUENDER and BENTON, Circuit Judges.

_____

SMITH, Chief Judge.

Inline Packaging, LLC ("Inline") and Graphic Packaging International, LLC ("Graphic") are competitors in the susceptor-packaging market. Inline filed suit against Graphic, alleging antitrust and tortious-interference claims. Both parties

moved for summary judgment, and the district court[1] granted Graphic's motion. Inline appeals. After reviewing the evidence and drawing all reasonable inferences most favorably to Inline, we affirm.

## I. *Background*
### A. *Susceptor and Paperboard Packaging*

Both Inline and Graphic produce susceptor packaging. Susceptor packaging is a specialized food packaging that converts microwave energy into high temperatures, which heat, crisp, and brown frozen foods. Graphic, unlike Inline, also manufactures paperboard and carton packaging such as cereal boxes and soft drink cartons. Additionally, consumer-packaged-goods (CPG) companies such as Nestlé, Conagra, Heinz, Schwan's, and Pinnacle represent the dominant purchasers of susceptor and paperboard packaging and constitute some of Inline's and Graphic's customers.

Graphic also negotiates "multi-year, multi-product supply agreements" with all the CPG purchasers except for Nestlé. Appellee's Br. at 12. Typical agreements cover both susceptor and paperboard products, last for one to four years, and include financial incentives and discounts such as "price caps, annual price reductions, volume-based discounts, and signing bonuses." *Id.* Such supply agreements "are common in the industry." *Inline Packaging, LLC v. Graphic Packaging Int'l, LLC*, 351 F. Supp. 3d 1187, 1195 (D. Minn. 2018).

In July 2015, when this lawsuit was filed, Graphic held nearly 95 percent of the susceptor-packaging market in the United States, and Inline held approximately 4.6 percent. Meanwhile, the paperboard-packaging market was less concentrated and intensely competitive. Graphic's paperboard competitor, WestRock, reported revenue of $15.5 billion in 2015, "which more than tripled Graphic's revenue of $4.3 billion

---

[1]The Honorable Ann D. Montgomery, United States District Judge for the District of Minnesota.

for that year." *Id.* at 1194. Other competitors include "International Paper, Burd & Fletcher, and other regional and private label competitors." *Id.* "Competition between Graphic, WestRock, and International Paper is intensified because these three firms are vertically integrated with paper mills." *Id.* "[T]hese firms . . . must compete for large paperboard orders that will enable them to operate" near or at full capacity while also offering lower prices. *Id.* at 1195. Savvy buyers take advantage of their purchasing options and stimulate vigorous competition in the paperboard packaging market.

### B. *Graphic's Patent-Infringement Suit*

Although Graphic's patent-infringement claims against Inline are not part of the present case, the context of the patent dispute illuminates this appeal. In 2001, well before the patent litigation between Graphic and Inline ensued, Graphic and Chef America, Inc. ("Chef America")—Nestlé's predecessor—partnered "on two projects related to susceptor sleeve packaging: 'Project Quantum' involved increasing filling in Hot Pockets; 'Project Roxanne' was the packaging component of Project Quantum." Appellant's Br. at 7–8 (internal citations omitted). Graphic's business development director, Jeff Voyzey, served as the primary sales contact for these two projects.

Graphic and Chef America developed an original design for the susceptor sleeve in 2001. This design included a four-sided sleeve "with tear strips, pillow packs, and gussets." *Inline Packaging*, 351 F. Supp. 3d at 1199. Graphic created drawings of Chef America's concept and sold 500 sample sleeves to Chef America for just over $3,600. In particular, Graphic sold drawing sample sleeves 50019D and 50019F.

In 2005, Graphic and Nestlé entered into a Joint Development Agreement (JDA) to redesign the susceptor sleeve.[2] Graphic's intellectual property counsel—Barry Biddle—negotiated, drafted, and approved the JDA. The JDA required Nestlé to provide "packaging criteria and concepts, assist Graphic as requested, and . . . test concepts developed by Graphic." *Id.* It also "provided for seven years of mutual exclusivity—Nestlé would purchase 100% of its requirements from Graphic and Graphic would not provide the same packaging to Nestlé's competitors—for any designs that Nestlé ultimately selected." *Id.*

In the JDA, Graphic and Nestlé also contemplated securing their intellectual property with patents. "Inventions that were solely invented by one party were to remain the property of the originating party. Inventions that were jointly invented were to be owned jointly in accordance with the law governing such jointly owned patents." *Id.* (cleaned up).

Pursuant to the JDA and Project Roxanne, Graphic obtained several patents that claimed priority to a provisional patent application filed on December 8, 2005, and a non-provisional patent application filed on December 6, 2006. Four of the patents are at issue in the instant litigation (the "asserted patents").[3] Graphic asserted patent claims on the redesign of the susceptor sleeve for Nestlé's frozen food products, including its Hot Pockets® brand. The patents "claim unique sleeves with a distinctive visual appearance that serve as containers for browning and/or crisping food products in microwaves and as carrying containers after heating." Appellee's Br. at 5.

---

[2]At this point, Nestlé had acquired Chef America.

[3]The relevant patents at issue are designated as United States design patents D694,106; D694,124; and D727,145. United States patent 8,872,078 ("'078 patent")—designated as the main utility patent—has been declared unpatentable based on obviousness. *See infra* n.4.

On its patent applications, Graphic listed its employee—Kelly Fitzwater, a computer-aided design (CAD) drafter—as the first and sole inventor of the redesign claimed in the asserted patents. Fitzwater began the redesign process by modifying drawing sample 50019D. However, Fitzwater did not work alone. Graphic and Nestlé—through its former packaging engineer, Cory Brower—collaborated throughout the entire process. Brower provided Graphic with certain concepts and feedback while Fitzwater implemented those ideas into the ultimate redesign. During the redesign process, Brower and Voyzey requested that Fitzwater add or delete certain features from various drawings she created. After modifying the sleeve to include only one tear down panel in drawing 51616G, Fitzwater signed three new invention disclosures. That, in turn, triggered Graphic to seek full patent protection for the completely revised design.

A few years later, in 2011, Inline secured Nestlé's Kahiki susceptor-sleeve business for 2012 and 2013. Graphic noted Inline's rise as a serious competitor in the susceptor-packaging market. This eventually prompted Graphic to "play the patent card." *Inline Packaging*, 351 F. Supp. 3d at 1198 (internal quotation omitted).

Upon renewal of its susceptor-sleeve business in 2014, Nestlé held a one-day auction to choose the companies that would supply susceptor sleeves for its Kahiki, Croissant Pockets, and Hot Pockets® product lines. The auction's terms and conditions "provided that a two or three year contract would be awarded, that the lowest bid price does not guarantee a business award, and that a formal contract would be drafted after the auction that would take precedent over anything specified in the [request for proposal]." *Id.* at 1196.

Using an online system, Nestlé initially informed Inline that it had been awarded Nestlé's entire susceptor-sleeve business. But Nestlé later decided to split the business between Inline and Graphic after Graphic notified Nestlé "that it had

patents on [the] susceptor sleeves [requested in the proposal], and that a new supplier would likely be infringing those patents if Nestlé elected to steer its susceptor business away from Graphic." *Id.* at 1197. As a result, Nestlé awarded Inline its Kahiki and Croissant Pockets product lines and awarded Graphic its Hot Pockets® line, which represented about 90 percent of Nestlé's entire susceptor-sleeve business.

In May 2015, Graphic sent a cease-and-desist letter to Inline asserting infringement of its patents. Graphic's letter stated its intention to sue Inline for patent infringement if Inline failed to comply with its request. After Graphic notified Nestlé about the cease-and-desist letter, Nestlé awarded Graphic a three-year extension in which Nestlé had to purchase 85 percent or more of its 2016 susceptor-sleeve business from Graphic. In June 2015, Graphic filed its patent-infringement suit against Inline based on its asserted patents. *See Graphic Packaging Int'l, LLC v. Inline Packaging, LLC*, No. 15-CV-03476-ECT-LIB, 2019 WL 4786148 (D. Minn. Oct. 1, 2019).[4]

---

[4]Graphic initially filed suit against Inline in the District of Delaware. The District of Delaware transferred the case to the District of Minnesota. *Id.* at *2.

Inline successfully petitioned for *inter partes* review of Graphic's '078 patent. *See id.* The district court stayed Graphic's patent-infringement case, and the United States Patent Trial and Appeal Board ("Board") eventually invalidated the '078 patent. *Id.* After the Federal Circuit affirmed the Board's decision, the district court lifted the stay in the patent-infringement case. *Id.* Therefore, Graphic's patent-infringement case only involves the three design patents. *Id.* In October 2019, the district court entered an order adopting Graphic's claim construction for the asserted patents, *see id.* at *5, and at the filing of this opinion, the case remains pending.

## C. *Inline's Antitrust Suit*

Shortly after Graphic initiated its patent-infringement lawsuit against Inline, Inline filed the instant antitrust suit against Graphic in July 2015. Inline alleged that Graphic monopolized the susceptor-packaging market using anticompetitive conduct in response to competition from Inline and other competitors. Inline asserted that Graphic's conduct prevented it from competing in the susceptor-packaging market. Inline alleged that Graphic (1) possessed illegal monopoly power, in violation of federal and state antitrust laws, and (2) tortiously interfered with Inline's prospective business and contractual relations.[5]

Specifically, Inline contended that Graphic fraudulently procured the asserted patents, made baseless litigation threats relating to the asserted patents, and used predatory-discount bundling in Graphic's supply agreements with the CPG companies. Inline also claimed tortious interference because of "Graphic's assertions to Nestlé that the Hot Pockets sleeve design was protected by the Asserted Patents." *Inline Packaging*, 351 F. Supp. 3d at 1201.

Following various motions and discovery, the parties moved for summary judgment in 2018. The district court granted Graphic's motion, dismissing all of Inline's claims. It simultaneously denied Inline's motion for partial summary judgment. Inline subsequently filed this timely appeal.

---

[5]In its complaint, Inline listed tortious interference with prospective business relations as Count I; tortious interference with existing contractual relations as Count II; illegal monopoly power, in violation of state law—Minn. Stat. § 325D.52—as Count IV; and illegal monopoly power, in violation of federal law—the Sherman Antitrust Act, codified at 15 U.S.C. § 2—as Count V. Inline's claim for misappropriation of trade secrets (Count III) is not raised on appeal; therefore, we deem it waived. *See Jenkins v. Winter*, 540 F.3d 742, 751 (8th Cir. 2008).

II. *Discussion*

A. *Standard of Review*

We review de novo a district court's grant of summary judgment. *In re Wholesale Grocery Prods. Antitrust Litig.*, 752 F.3d 728, 732 (8th Cir. 2014). Our review looks to see "whether the record evinces a 'genuine dispute as to any material fact.'" *Id.* at 733 (quoting Fed. R. Civ. P. 56(a)). We will affirm only if "the evidence, viewed in the light most favorable to . . . [Inline], demonstrates that there is no genuine issue of material fact and that . . . [Graphic] is entitled to judgment as a matter of law." *Warner Bros. Entm't v. X One X Prods.*, 644 F.3d 584, 591 (8th Cir. 2011) (quoting *Schoolhouse, Inc. v. Anderson*, 275 F.3d 726, 728 (8th Cir. 2002)).

B. *Antitrust Claims*

Inline maintains that Graphic is a monopolist in the United States susceptor-packaging market and that Graphic achieved monopoly power through anticompetitive conduct. Inline contends that the district court erred in dismissing its claims against Graphic for fraudulent procurement, sham threats and litigation, and predatory-discount bundling. It also argues that its exclusive-dealing claim was properly pleaded before the district court.

Inline brings these antitrust claims under both the Sherman Antitrust Act and Minnesota state law. *See* 15 U.S.C. § 2; Minn. Stat. § 325D.52. "Minnesota antitrust law is generally interpreted consistently with federal antitrust law." *Lorix v. Crompton Corp.*, 736 N.W.2d 619, 626 (Minn. 2007).

"Section 2 of the Sherman Act prohibits monopolizing, or attempting to monopolize any part of the trade or commerce among the several States." *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1060 (8th Cir. 2000) (cleaned up). Inline must prove the following to establish a Section 2 violation: "1) . . . [Graphic] possessed monopoly power in the relevant market and 2) . . . [Graphic] willfully

acquired or maintained this monopoly power by anticompetitive conduct as opposed to gaining that power as a result 'of a superior product, business acumen, or historical accident.'" *Id.* (quoting *United States v. Grinnell Corp.*, 384 U.S. 563, 571 (1966)). "Monopoly power is defined as the power to control prices or exclude competition." *Id.* (internal quotation omitted).

### 1. *Fraudulent Procurement*

Patent fraud, also referred to as *Walker Process* fraud, can support an illegal monopolization claim under 15 U.S.C. § 2. *See Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.*, 382 U.S. 172 (1965).

> *Walker Process* set forth two conditions for antitrust liability based on the fraudulent procurement of a patent. First, the plaintiff must show that the defendant procured the relevant patent by knowing and willful fraud on the [United States Patent and Trademark Office (USPTO)] or . . . that the defendant maintained and enforced the patent with knowledge of the fraudulent manner in which it was obtained. Second, the plaintiff must prove all the elements otherwise necessary to establish a Sherman Act monopolization charge.

*Ritz Camera & Image, LLC v. SanDisk Corp.*, 700 F.3d 503, 506 (Fed. Cir. 2012) (citing *Walker Process*, 382 U.S. at 174, 176–77).

To establish knowing and willful fraud, Inline must show an "intent to deceive or, at least, a state of mind so reckless as to the consequences that it is held to be the equivalent of intent (scienter)." *Hydril Co. LP v. Grant Prideco LP*, 474 F.3d 1344, 1349 (Fed. Cir. 2007) (internal quotation omitted). This seems to be "nearly identical" to the evidentiary showing of inequitable conduct. *TransWeb, LLC v. 3M Innovative Props. Co.*, 812 F.3d 1295, 1307 (Fed. Cir. 2016). Inequitable conduct is demonstrated when "a district court . . . find[s] by clear and convincing evidence that a patent applicant breached its duty of candor and good faith to the [USPTO] by

failing to disclose material information, or submitting false material information, with an intent to deceive the [US]PTO." *Monsanto Co. v. Bayer Bioscience N.V.*, 514 F.3d 1229, 1233–34 (Fed. Cir. 2008).

On appeal, Inline first argues that the district court erred in not finding, at the very least, a genuine factual dispute as to whether Graphic fraudulently "procured patents on packaging concepts and designs through false claims of inventorship" of the asserted patents and fraudulently concealed prior sales of drawing sample sleeves 50019D/F. Appellant's Br. at 26.

a. *Inventorship*

As to inventorship, Inline disputes whether Fitzwater, the CAD drawer, is really the first and sole inventor of the susceptor-sleeve redesign claimed in Graphic's asserted patents. It argues, "At most, [Fitzwater] assisted Nestl[é] personnel after they conceived of the claimed design concepts. Fitzwater thus provided no more than general assistance in Nestl[é]'s development of new sleeve designs—which is insufficient for her to be an inventor." *Id.* at 31. Without providing the names of Nestlé's inventors or co-inventors, Inline suggests that Graphic fraudulently obtained the asserted patents by deceiving the USPTO. In addition, Inline asserts that "[t]he district court . . . ignored . . . evidence showing Brower and Nestl[é]'s contributions, testimony connecting those contributions to the Asserted Patents, Inline's patent expert's analysis, documents . . . demonstrat[ing] Graphic's knowledge of Nestl[é]'s contributions and plans to apply for patents . . . , the modified and false invention disclosure forms, and Graphic's ulterior motives." *Id.* at 33.

In its analysis, the district court found that no former or current employee at Nestlé claims to be an inventor or co-inventor with Fitzwater. Based on this, the court concluded that Graphic did not act with the requisite intent to deceive the USPTO. After examining the record, we concur. No genuine dispute of material fact exists

when the record lacks evidence demonstrating that Nestlé solely or jointly invented the redesign of the susceptor sleeve claimed in the asserted patents. Brower, who is Nestlé's former packaging engineer, did not declare that he invented or co-invented the redesign, and currently, Nestlé has not come forth with any claims to the redesign covered by the asserted patents.

The district court's analysis accords with *Pro-Mold & Tool Co. v. Great Lakes Plastics, Inc.*, 75 F.3d 1568 (Fed. Cir. 1996). "When an alleged omitted co-inventor does not claim to be such, it can hardly be inequitable conduct not to identify that person to the [US]PTO as an inventor." *Id.* at 1576. Neither Inline nor Nestlé has identified any alleged Nestlé inventor or co-inventor of the susceptor sleeve's new design, and Inline's attempt to distinguish *Pro-Mold* fails. *Pro-Mold* involved an alleged co-inventor who "agreed that it was his father who conceived the idea [that was claimed in the patent]." *Id.* Inline asserts that "neither Brower, nor anyone else at Nestl[é], has affirmatively *disclaimed* inventorship" like the alleged co-inventor in *Pro-Mold*. Appellant's Br. at 32 (emphasis added). This may be true, but Inline ignores that neither Brower nor any Nestlé employee has affirmatively *claimed* inventing the redesign of the susceptor sleeve covered by the asserted patents. On this record, we therefore affirm the district court's dismissal of Inline's claim of fraudulent procurement of the asserted patents based on false inventorship.

b. *Prior Sales*

Inline further contends that "Graphic also defrauded the USPTO by concealing highly-material prior sleeve sales to Nestl[é]. There is no dispute that prior sales of the 50019D/F designs (. . . [used by] Fitzwater . . .) took place." Appellant's Br. at 34. Graphic does not dispute that these prior sales occurred,[6] but it argues that no genuine

---

[6]Invalidating a patent on the basis of prior sales, also known as the on-sale bar, "is triggered when a claimed invention is: (1) ready for patenting; and (2) the subject of a commercial offer for sale prior to the critical date." *Merck & Cie v. Watson Labs.,*

dispute exists as to the material facts: (1) Graphic's employees who owed a duty of candor to the USPTO did not know that the prior sales were material, and (2) such sales were indeed immaterial.

"Congress has imposed several conditions on the limited opportunity to obtain a property right in an idea. One such condition is the on-sale bar, which reflects Congress'[s] reluctance to allow an inventor to remove existing knowledge from public use by obtaining a patent covering that knowledge." *Helsinn Healthcare S.A. v. Teva Pharm. USA, Inc.*, 139 S. Ct. 628, 632 (2019) (cleaned up). "Every patent statute since 1836 has included an on-sale bar." *Id.* at 633. The applicable statute here, 35 U.S.C. § 102, prohibits patentability if "the claimed invention was . . . *on sale*, or otherwise available to the public" more than one year before the filing of a patent application. 35 U.S.C. § 102(a)(1), (b)(1) (emphasis added).

"Applicants for patents are required to prosecute patent applications in the [US]PTO with candor, good faith, and honesty." *Molins PLC v. Textron, Inc.*, 48 F.3d 1172, 1178 (Fed. Cir. 1995) (internal footnote omitted). "A breach of this duty constitutes inequitable conduct." *Id.* Inequitable conduct can certainly arise out of one's failure to disclose information that is material—such as prior sales—with the intent to deceive the USPTO. *Id.*; *see also Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276, 1290 (Fed. Cir. 2011) (en banc). Moreover, various individuals may be subject to this duty.

> [T]he duty to disclose information material to patentability rests on the inventor, on each attorney or agent who prepares or prosecutes an application and on every other individual who is substantively involved in the preparation or prosecution of the application and who is

---

*Inc.*, 822 F.3d 1347, 1351 (Fed. Cir. 2016).

associated with the inventor, with the assignee, or with anyone to whom there is an obligation to assign the application.

*Molins*, 48 F.3d at 1178 n.6 (citing 37 C.F.R. § 1.56).

Here, Inline contends that certain Graphic employees owed a duty to disclose to the USPTO that the 50019D/F design samples were sold to Chef America in 2001, more than a year before Graphic filed applications for the asserted patents in 2005 and 2006. According to Inline, the following employees owed this duty: Fitzwater, the CAD drawer; Biddle, the intellectual property counsel; and Voyzey, the business development director. We agree with the district court that there is no "need [to] resolve the issue of whether the prior sales were material" to the patentability of the asserted patents "because even if they were [material],[7] Inline has offered no . . . clear and convincing evidence . . . that anyone at Graphic owing a duty of candor to the [US]PTO knew that the prior sales were material [*and*] deliberately chose not to disclose them." *Inline Packaging*, 351 F. Supp. 3d at 1204 (emphasis added).

Inline makes two arguments. First, Inline avers that "despite knowing Graphic's long-term relationship with Nestl[é] and the origins of the patented sleeve designs, neither Fitzwater [n]or Biddle conducted any due diligence in connection with the submissions to the USPTO related to similar designs created and sold in the past." Appellant's Br. at 35. It insists that the district court improperly assessed the credibility of Fitzwater's and Biddle's testimonies, decided factual disputes, and, in turn, "invad[ed] the province of the jury." *Id.* at 36. Second, Inline infers that because

---

[7]"[I]n assessing the materiality of a withheld reference, the court must determine whether the [US]PTO would have allowed the claim if it had been aware of the undisclosed reference." *Therasense*, 649 F.3d at 1291. A court making this patentability determination "should apply the preponderance of the evidence standard and give claims their broadest reasonable construction." *Id.* at 1291–92.

Voyzey "*made the prior sales* to Nestl[é]," he somehow knew that those sales were material to the claimed design in the asserted patents. *Id.* at 38.

We begin with the latter argument. Simply put, the record lacks evidence that Voyzey, Graphics's business development director, knew that the sales were material to the patentability of the asserted patents. Further, as the district court concluded, the record does not show that Fitzwater knew of the 50019F design or that she knew Graphic had sold samples of both designs to Chef America in 2001. She became involved with Project Roxanne in 2005 and used the 50019D design as a starting point to begin the redesign of the susceptor sleeve for Nestlé's products. She testified that, after months of drawings and revisions, the original design of 50019D was transformed into a different and new sleeve. Likewise, Biddle testified that his employment at Graphic began in 2004 and that he simply did not know anything about Project Quantum or the sales to Chef America, which had occurred three years before the start of his employment.

Despite Inline's contention that Fitzwater and Biddle should have exercised due diligence before filing the asserted patent applications, it is well-established "that a duty to investigate does not arise where there is no notice of the existence of material information." *Brasseler, U.S.A. I, L.P. v. Stryker Sales Corp.*, 267 F.3d 1370, 1382 (Fed. Cir. 2001). This case differs from *Brasseler*. There, the patentee's attorneys had been notified of an event with the potential of creating an on-sale bar. *Id.* at 1376. They, nevertheless, chose not to further investigate before filing the patent application claiming priority to a newly-invented surgical blade. *Id.* at 1374–76. Here, neither Fitzwater nor Biddle had been notified about the existence of material information, and accordingly, they did not need to "pursue a fishing expedition to obtain [it]." *Id.* at 1382.

Significantly, "a finding of deceptive intent may not be based solely on gross negligence, including instances in which . . . [Fitzwater or Biddle] [was] completely unaware of the existence of specific information later discovered and found to be material." *Id.* And "when there are multiple reasonable inferences that may be drawn, intent to deceive cannot be found." *Therasense*, 649 F.3d at 1290–91. Instead, to meet the clear and convincing standard, the evidence must establish that "the single most reasonable inference" to be drawn is that Fitzwater, Biddle, and Voyzey acted with a specific intent to deceive the USPTO. *Id.* at 1290 (internal quotation omitted). The evidence here does not establish such. Hence, we affirm this claim's dismissal and hold that the record lacks direct or circumstantial evidence that Graphic's employees acted with the requisite intent to deceive the USPTO. *See id.*

Because we hold that Inline cannot establish the first condition of its *Walker Process* claims—knowing and willful fraud—we need not analyze the other elements of a monopolization claim under 15 U.S.C. § 2.

## 2. *Sham Threats and Litigation*

In addition to its *Walker Process* claims, Inline presents an additional theory of antitrust liability: "claims for sham threats and litigation alleging that Graphic knew the Asserted Patents were invalid when it subsequently asserted the patents in 2014 and 2015." Appellant's Br. at 40. Inline argues that the district court erroneously characterized these claims as "'recycled version[s]' of its *Walker Process* claims." *Id.* (alteration in original).

The *Noerr-Pennington*[8] doctrine immunizes acts related to the constitutional right to petition the courts for grievance, unless the act is

---

[8] *See United Mine Workers of Am. v. Pennington*, 381 U.S. 657 (1965); *E.R.R. Presidents Conf. v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961).

-15-

a mere sham. The First Amendment to the United States Constitution provides that Congress shall make no law abridging the right to petition the Government for a redress of grievances. The *Noerr-Pennington* doctrine, which arose in the context of antitrust claims, provides immunity from claims that are based on the filing of lawsuits.

*Select Comfort Corp. v. Sleep Better Store, LLC*, 838 F. Supp. 2d 889, 896 (D. Minn. 2012) (internal quotation omitted). The sham exception to the *Noerr-Pennington* doctrine consists of two elements:

First, the lawsuit must be objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits. If an objective litigant could conclude that the suit is reasonably calculated to elicit a favorable outcome, the suit is immunized under *Noerr*, and an antitrust claim premised on the sham exception must fail. Only if challenged litigation is objectively meritless may a court examine the litigant's subjective motivation. Under this second part of [the] definition of sham, the court should focus on whether the baseless lawsuit conceals an attempt to interfere directly with the business relationships of a competitor through the use of the governmental process—as opposed to the outcome of that process—as an anticompetitive weapon.

*Prof'l Real Estate Inv'rs, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 60–61 (1993) (cleaned up).

In this instance, Graphic accurately states, "Inline's attempt to meet these requirements relies exclusively on the same facts that allegedly constitute fraudulent conduct before the [US]PTO." Appellee's Br. at 37 (citing Appellant's Br. at 41 ("Graphic's assertion of its patents and pursuit of the infringement litigation was 'objectively baseless' in light of, *inter alia*, Graphic's collaboration with Nestlé; the

-16-

terms of the JDA; and direct evidence of incorrect inventorship and prior sales.")).
Based on our previous discussion in Part II.B.1, we conclude that Inline cannot meet the objectively baseless element of the sham exception to the *Noerr-Pennington* doctrine. As we stated above, Inline did not evidence fraud related to Graphic's procurement of the asserted patents and its prior sales of drawing sample sleeves 50019D/F. It has not established why the same set of facts and evidence would render Graphic's patent-infringement litigation objectively baseless; consequently, we affirm the district court's dismissal of Inline's sham-litigation claim. As a result, we need not address Graphic's subjective intent under the exception.

### 3. *Discount Bundling*

Next, Inline asserts that the district court misconstrued its discount-bundling claim as a tying claim. The bundle discounts relate to Graphic's supply agreements with the CPG companies that include both susceptor and paperboard packaging. Inline also asserts that the district court erroneously applied its own economic policy and impermissibly weighed expert testimony to dismiss Inline's allegations that Graphic's bundled discounts were a part of Graphic's anti-competitive scheme.

Graphic responds by arguing that "Inline's antitrust bundling claim fails because there was no evidence Graphic had monopoly/market power in paperboard, which Inline's own expert admitted was necessary." Appellee's Br. at 16. It adds that even if Inline can establish that Graphic had monopoly or market power related to Graphic's paperboard sales, Inline cannot refute that "Graphic's prices were above cost." *Id.* And, even if Inline can establish Graphic's monopoly or market power and below-cost pricing, Graphic contends that Inline's arguments still fall short of demonstrating harm to competition.

The Ninth Circuit has defined "[b]undling [a]s the practice of offering, for a single price, [multiple] goods . . . that could be sold separately. A bundled discount

-17-

occurs when a firm sells a bundle of goods . . . for a lower price than the seller charges for the goods . . . purchased individually." *Cascade Health Sols. v. PeaceHealth*, 515 F.3d 883, 894 (9th Cir. 2008). Put differently, a bundled package provides cost savings without coercing one to purchase it. *Id.* at 900. Conversely, a tying claim requires the plaintiff to prove that a defendant coerced the plaintiff to accept the products and cost savings. *Id.* We first note that the district court properly viewed Inline's arguments as a discount-bundling claim.

Our circuit has not adopted a standard for determining when discount bundling turns anti-competitive; so, this issue is one of first impression for this court.[9] The district court endorsed and applied the Ninth Circuit's approach, the discount-attribution test. *Cascade Health*, 515 F.3d at 894–909. In its opposition to Graphic's summary-judgment motion, Inline applied both the discount-attribution test and the Third Circuit's *LePage's* standard and contended that Graphic's motion fails under either approach. *See LePage's Inc. v. 3M*, 324 F.3d 141 (3d Cir. 2003) (en banc).

Upon review, we find it unnecessary to adopt either approach at this time. Both approaches require Inline to establish that Graphic is a monopolist or, at the very least, holds sufficient market power in the relevant or leveraging market. For purposes of Inline's discount-bundling claim, the relevant or leveraging market is the market for its paperboard sales.[10] Inline essentially argues that Graphic's power in the

_____

[9]We did analyze a discount-bundling claim in *Southeast Missouri Hospital v. C.R. Bard, Inc.*, 616 F.3d 888, 889 (8th Cir. 2010), but we later vacated that decision in *Southeast Missouri Hospital v. C.R. Bard, Inc.*, 642 F.3d 608 (8th Cir. 2011).

[10]"Antitrust claims often rise or fall on the definition of the relevant [or leveraging] market. The definition of the relevant market has two components—a product market and a geographic market." *Double D Spotting Serv., Inc. v. Supervalu,*

paperboard-packaging market allows it to offer discounts on bundles of susceptor and paperboard packaging. Such power would enable Graphic to "foreclose portions of the [susceptor] market" to competitors that do not offer both products. *LePage's Inc.*, 324 F.3d at 155. But Inline has not shown that Graphic holds sufficient monopoly or market power regarding its paperboard sales to avoid summary judgment in Graphic's favor. *See Concord Boat*, 207 F.3d at 1060 ("To establish a Section 2 violation, plaintiffs must show that . . . the defendant possessed monopoly power in the relevant market . . . .").

Again, "[m]onopoly power is defined as the power to control prices or exclude competition." *Id.* (internal quotation omitted). And "[m]arket power generally is defined as the power of a firm to restrict output and thereby increase the selling price of its goods in the market." *Ryko Mfg. Co. v. Eden Servs.*, 823 F.2d 1215, 1232 (8th Cir. 1987). "Market power may be shown by a firm's percentage of sales in the market, especially where there is a strong consumer preference for the firm's product . . . and where there are significant barriers either to the entry of new firms or to increased output by existing firms." *Id.* The district court correctly pointed out that Inline's economic expert, Dr. James Levinsohn, acknowledged that proof of at least some market power in the relevant or leveraging market is needed for Inline's discount-bundling theory to be viable. Dr. Levinsohn, nonetheless, never ascribed any monopoly or market power to Graphic in the paperboard-packaging market, and Graphic's monopoly or market power in the susceptor-packaging market does not suffice to show Graphic's power in the paperboard-packaging market. Graphic also faced intense competition from paperboard-packaging companies such as WestRock

_____

*Inc.*, 136 F.3d 554, 560 (8th Cir. 1998) (cleaned up). The evidence does not even show that Inline has truly defined the proper product and geographic components of the paperboard-packaging market. But we will assume that the market has been properly defined.

and International Paper. Thus, we affirm the district court's dismissal of Inline's discount-bundling claim.

Relatedly, we hold that the district court adequately assessed the record and did not abuse its discretion in dismissing Dr. Levinsohn's untimely market opinion. Given during deposition, his opinion—that Graphic's accounting margins demonstrated it held sufficient market power in the paperboard-packaging market—came too late. Dr. Levinsohn offered this testimony after the submission of his expert reports without a sufficient justification for the delay. *See, e.g.*, *White v. Howmedica, Inc.*, 490 F.3d 1014, 1016 (8th Cir. 2007) ("We review the district court's sanction of excluding . . . expert testimony for an abuse of discretion and find none here." (internal footnote and citation omitted)).

## 4. *Exclusive Dealing*[11]

The parties also dispute whether Inline properly pleaded a claim based on the "antitrust implications of the exclusivity provisions of Graphic's bundles, and Graphic's exclusive arrangement with Nestl[é], which together foreclosed competition for more than 85% of the susceptor market." Appellant's Br. at 59. The district court rejected the claim on the basis that "[t]he operative Complaint, even broadly construed, does not allege an exclusive dealing claim." *Inline Packaging*, 351 F. Supp. 3d at 1213. The district court did not err in doing so. "[W]hile we recognize that the pleading requirements under the Federal Rules are relatively permissive, they do not entitle parties to manufacture claims, which were not pled, late into the

---

[11]"Exclusive dealing will generally only be unlawful where the market is highly concentrated, the defendant possesses significant market power, and there is some element of coercion present." *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 284 (3d Cir. 2012). "For example, . . . [a] defendant occup[ying] a dominant position in the market" has "the power to exclude rivals" through "its exclusive dealing arrangements." *Id.*

litigation for the purpose of avoiding summary judgment." *N. States Power Co. v. Fed. Transit Admin.*, 358 F.3d 1050, 1057 (8th Cir. 2004).

Inline's operative complaint includes five claims that discuss tortious interference, misappropriation of trade secrets, and antitrust theories based on patent invalidity, sham litigation, and discount bundling. After viewing the record, we found no order granting leave to file an amended complaint. Neither do Inline's record citations clearly show that it had actually pleaded a claim for exclusivity.

This court has declined to search a record for factual disputes where a party has not made sufficient citations to the record. A similar principle applies in this case to a search for an allegedly pleaded claim where the record consists of over 1,000 docket entries. *Cf. Johnson Tr. of Operating Eng'rs Local #49 Health & Welfare Fund v. Charps Welding & Fabricating, Inc.*, 950 F.3d 510, 524 (8th Cir. 2020) ("Even if there is some relevant information in the record, this court will not mine a summary judgment record searching for nuggets of factual disputes to gild a party's arguments." (internal quotation omitted)). The district court did not abuse its discretion in rejecting Inline's exclusive-dealing claim.[12] *See WireCo WorldGroup, Inc. v. Liberty Mut. Fire Ins. Co.*, 897 F.3d 987, 992 (8th Cir. 2018) (applying abuse of discretion standard).

C. *Tortious-Interference Claims*

Finally, we address Inline's claims for tortious interference with prospective business and contractual relations.[13] The prospective business interference relates to

---

[12]Even if we were to consider this claim, we would dismiss it for the reasons set forth in Part II.B.3.

[13]"To establish a claim of tortious interference with a prospective business relationship, a plaintiff must prove the defendant intentionally committed a wrongful

Nestlé's 2014 and 2016 awards of its susceptor-sleeve business to Graphic, and the contractual claim pertains specifically to the 2014 award.

The Federal Circuit has "held that federal patent law preempts state-law tort liability for a patentholder's good faith conduct in communications asserting infringement of its patent and warning about potential litigation." *Globetrotter Software, Inc. v. Elan Comput. Grp., Inc.*, 362 F.3d 1367, 1374 (Fed. Cir. 2004). "State-law claims such as [Inline]'s can survive federal preemption only to the extent that those claims are based on a showing of 'bad faith' action in asserting infringement." *Id.* This is equivalent to the objectively baseless element of the sham exception to the *Noerr-Pennington* doctrine. *See id.* at 1375.

We have already determined the record does not demonstrate that Graphic fraudulently procured its asserted patents or that its patent-infringement threats and suit were objectively baseless. Therefore, Inline's tortious-interference claims cannot survive federal preemption. We conclude that the district court properly dismissed Inline's tortious-interference claims.[14]

_____

act which improperly interfered with the prospective relationship." *Hunt v. Univ. of Minn.*, 465 N.W.2d 88, 95 (Minn. Ct. App. 1991). And "[a] cause of action for tortious interference with a contractual relationship requires five elements: (1) the existence of a contract; (2) the alleged wrongdoer's knowledge of the contract; (3) intentional procurement of its breach; (4) without justification; and (5) damages." *Kallok v. Medtronic, Inc.*, 573 N.W.2d 356, 362 (Minn. 1998) (internal quotation omitted).

[14]The district court dismissed Inline's contractual-related claim for an additional reason. It found that Inline and Nestlé had not formed a contract involving Nestlé's entire susceptor-sleeve business when Nestlé had decided to split its business between Inline and Graphic in 2014. For the reasons stated in the district court's order, we too agree that a contract did not exist. *See Inline Packaging,*

### III. *Conclusion*

Accordingly, we affirm the district court's grant of summary judgment in Graphic's favor.

_____

351 F. Supp. 3d at 1215–16.